IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

VICTORIA APODACA,
      Plaintiff,

v.

DISCOVER FINANCIAL SERVICES and
EQUIFAX INFORMATION SERVICES LLC ,
      Defendants.

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

05 DEC 28  PM 4: 23

CLERK·ALBUQUERQUE

CIV-04-0717 MCA/WDS

**PLAINTIFF'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

I.    **Equifax Violated the Fair Credit Reporting Act**

    A.    **Equifax Mixed Ms. Apodaca's Credit File with Another Person's and Did Not Separate the Two Files Despite Numerous Disputes**

Defendant Equifax Information Services LLC mixed Plaintiff Victoria Apodaca's credit file with the file of another person with a similar name. This other person's credit file included a bankruptcy and numerous derogatory accounts. As a result, despite Ms. Apodaca's exemplary credit rating which she had accumulated for 25 years, she paid a higher rate to finance a home for her son and she was denied credit elsewhere. Ms. Apodaca also suffered significant lost time, aggravation and embarrassment in connection with her repeated efforts to spur Equifax to correct the problems it had caused. Ms. Apodaca filed eight formal disputes, made dozens of telephone calls and sent numerous well-documented letters, over a one year period.

Ms. Apodaca sued Equifax under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA") seeking actual and punitive damages.

    B.    **The FCRA, § 1681i, Says Equifax Must Conduct Reasonable Investigations Concerning the Accuracy of Credit Information that a Consumer Specifically Disputes**

The FCRA establishes a legal duty that requires credit reporting agencies to allow



consumers to correct an inaccuracies on their credit files.  "If the completeness or accuracy of any item of information contained in a consumers's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute," Equifax must conduct a reinvestigation into the each disputed entry. *See*, 15 U.S.C. § 1681i.  When the consumer disputes an entry, the agency must conduct a genuine reinvestigation:

> A credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position that one who has no such notice . . when a credit reporting agency receives such notice, it can target its resources in a more efficient manner and conduct a more thorough investigation.

*Henson v. CSC Credit Services*, 29 F.3d 280, 286-87 (7th Cir. 1994).

The FCRA sets explicit standards and procedures that Equifax must perform when a consumer sends information or documents supporting the dispute.

- Equifax "shall review and consider all relevant information submitted by the consumer," making its own decision whether to correct the credit report. *See*, 15 U.S.C. § 1681i(a)(4);

- Equifax must forward to the business who reported the disputed information, "all relevant information" regarding the dispute that it receives from the consumer. This information enables the reporting business to adequately determine whether the consumer's dispute is valid. See, 15 U.S.C. § 1681i(a)(2)(B).

## C.   The FCRA, § 1681e(b) Says Equifax Must Follow Reasonable Procedures to Assure *"Maximum Possible Accuracy"*

The FCRA sets a high standard concerning the reporting of consumer credit information. All credit reporting agencies – including Equifax – must meet this standard in recognition of the "grave responsibilities" these agencies possess in maintaining the accuracy of consumer credit in

America. *See,* 15 U.S.C. § 1681(a)(4).

Equifax must implement and "follow reasonable procedures to assure *maximum possible accuracy*" of consumer credit information. *See,* 15 U.S.C. § 1681e(b) (emphasis added). This standard applies to all consumer credit information that Equifax reports, not just information that a consumer specifically disputes. It also applies to information that Equifax continues to report after that information was disputed. If a credit reporting agency continues to report inaccurate information after it has had a chance to correct the incorrect information – but failed to correct it, because its dispute process was not reasonable as applied to the particular facts of that dispute – then the credit reporting agency fails to comply with § 1681i *and* § 1681e(b). *See, Hyde v. Hibernia National Bank,* 861 F.2d 446 (5th Cir. 1988) (each publication of inaccurate credit information states new and distinct FCRA claim).

### D.    Under the FCRA, a Jury Can Award Punitive Damages Where the Defendant's Actions Show a Conscious Disregard of the Consumers' Rights

In the FCRA, Congress provided for punitive damages where a credit reporting agency "willfully fails to comply with any requirement" of the FCRA. *See,* 15 U.S.C. § 1681n(a)(2). To willfully violate the FCRA, the credit reporting agency must have knowingly and intentionally committed an action or inaction in conscious or reckless disregard of consumers' rights.[1] In *Reynolds v. Hartford Financial Services Group, Inc.,* 426 F.3d 1020, 1037 (9th Cir. 2005), the Ninth Circuit surveyed the federal circuits. In an eminently well-reasoned opinion, it showed

---

[1] In non-FCRA contexts, the Tenth Circuit has long followed the definition of "willful" given by the United States Supreme in *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 11, 128 (1985). The Ninth Circuit cited this standard in *Reynolds* as further support of its interpretation of "willful" under the FCRA. 426 F.3d at 103. A violation is "willful" where the violation evinces reckless disregard for whether it is lawful. *Furr v. AT&T Technologies, Inc.,* 824 F.2d 1537, 1546 (10th Cir. 1985). A "willful" standard is less than "a stricter standard that would require intent, in the sense of evil motive or bad purpose." *Id.* "Willful" means "not accidental" or "on purpose, hence, knowingly, and carelessly done in violation of law, and in disregard of the safety of the public." *Dun & Bradstreet, Inc. v. Nicklaus,* 340 F.2d 882 (8th Cir. 1965), *cert. denied,* 382 U.S. 825 (1965).

that the weight of circuit authority overwhelmingly holds[2]:

> as used in FCRA "willfully" entails a "conscious disregard" of the law, which
> means "either knowing that policy [or action] to be in contravention of the rights
> possessed by consumers pursuant to the FCRA or in reckless disregard of whether
> the policy [or action] contravened those rights.

*Id.* at 1037, *quoting, Cushman v. Trans Union Corporation*, 115 F.3d 200, 227 (3rd Cir. 1997).

*See also, Phillips v. Grendahl*, 312 F.3d 357, 370 (8th Cir. 2002); *Dalton v. Capital Associated*

*Industries*, 257 F.3d 409, 418 (4th Cir. 2001); *Cousin v. Trans Union Corporation*, 246 F.3d 359,

372 (5th Cir. 2001); *Duncan v. Handmaker*, 149 F.3d 424, 429 (6th Cir. 1998).

> The *Reynolds* court equated "conscious disregard" with "reckless disregard."

> In sum, if a company knowingly and intentionally performs an act that violates the
> FCRA, either knowing that the action violates the rights of consumers *or in*
> *reckless disregard of those rights*, the company will be liable under 15 U.S.C. §
> 1681n for willfully violating consumers' rights.

*Reynolds* at 1038.  Furthermore proof of malice or evil motive is not required.  *Reynolds*, 426

F.3d at 1037; *Dalton*, 257 F.3d at 418; *Cousin v. Trans Union Corporation*, 246 F.3d at 372;

*Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998); *Cushman v. Trans Union*

*Corporation*, 115 F.3d 200, 226 (3rd Cir. 1997).  Proof of willfulness need not be in the form of

a "smoking gun," rather "the trier of fact may deduce it from surrounding circumstances."

*Mirocha v. TRW, Inc.*, 805 F.Supp. 663, 675 (S.D. Ind. 1992).

---

[2] The Tenth Circuit has not interpreted "willful" in the context of the FCRA, except in relation to an FCRA provision that imposes criminal liability "upon any person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses."  *See; Zamora v. Valley Federal Savings & Loan Association*, 811 F.2d 1368 (10th Cir. 1987); *Heath v. Credit Bureau of Sheridan, Inc.*, 618 F.2d 693, 697 (10th Cir. 1980) ("We do not take a position" on interpretation of "willful" under § 1681n).  The *Zamora* court's interpretation does not apply here because in *Zamora*, the Tenth Circuit was interpreting "willful" in conjunction with § 1681q, a provision not implicated here.  § 1681q, unlike the rest of the FCRA, expressly requires proof of "false pretenses."

## II.   Ms. Apodaca Disputes Many of Equifax's Alleged Facts

### A.   Equidax Misrepresents the Reasons It Switched to an Automated Outsource Dispute System (Fact No. 4)

Equifax asserts that it maintains an automated credit reporting system "[i]n order to provide more prompt, current and complete records to its customers." *See,* Equifax's brief, p. 3. This self-serving claim is pure argument – and fabrication.

Equifax testified that it revised the reinvestigation procedure as a cost savings measure.[3] It formerly had employed people in its Atlanta office to reinvestigate disputes. The system worked well. *See,* Exhibit 1, Fluellen deposition, 56:25 - 57:1. In about 1999 it started to "outsource." It fired most of the Equifax employees who had done this work and began hiring outside companies whose employees are located in Jamaica, Canada and the Philippines. *See,* Exhibit 1, 57:8-15, 58:1-6, 59:11-13.[4] Equifax never conducted any studies to determine the accuracy of this automated outsource system. *Id.* at 61:18-24.

### B.   Ms. Apodaca's Name Is Not the Same as the Name of the Person With Whom Equifax Mixed Her File (Fact No. 9)

Equifax claims that Ms. Apodaca's name and the name of the person with whom Equifax mixed her file are the same. *See,* Equifax's brief, p. 4. This claim is false.

The Plaintiff's name is Victoria Apodaca. The name of the person with whom Equifax mixed her file is Maria Victoria Lopez Apodaca. This other woman uses the first name of "Vicky" and often uses "Lopez" as a middle name or "L" as a middle initial. *See,* Exhibit 2, Maria V. Lopez Apodaca deposition. 5:2-7.

---

[3]   Equifax also claimed it outsourced because of the turnover rate in Atlanta. Thus, its "solution" to turnover was to fire almost all of its experienced employees to hire people who had *never* done this type of work. The jury is entitled to find that this absurd argument is a pretext to cover its cost-cutting strategy.

[4]   Deposition references are to page and lines. "57:8-15" means page 57, lines 8 to 15.

### C.    Equifax's Dispute System Is Not the Only Possible System (Facts Nos. 15-18 and 24)

Equifax presents its dispute system as the only dispute possible system. *See*, Equifax's brief, p. 4 ("15. There are three ways in which consumer credit information may be changed ..."). Equifax's allegation is misleading. Equifax is free to change its dispute system at any time. The only limitations on its system are the strictures set forth in the FCRA.

For example, a system that complies with the FCRA might be quite simple: a single person could investigate and take the task seriously. Citizens Bank of Las Cruces used that system. Equifax reported a derogatory Citizens Bank of Las Cruces account on Ms. Apodaca's credit report. The account actually belonged Maria V.L. Apodaca. Ms. Apodaca resolved that dispute with a phone call to Citizens Bank. The Citizens Bank employee involved testified that it took "[j]ust a matter of minutes" to determine the account belonged to someone other than Ms. Apodaca "because nothing matched." *See*, Exhibit 3, Ms. Vaughan deposition, 8:9-25, 9:1-24.

### D.    Choicepoint Did Not Tell Equifax to Verify or to Delete the Bankruptcy that Equifax Reported on Ms. Apodaca's Credit File (Facts Nos. 20, 21, 22 and 44)

Equifax claims that Choicepoint, the company that it hires to provide and to verify bankruptcy court information, verified that the bankruptcy belonged to the plaintiff. *See*, Equifax's brief, pp. 5 and 8. This claim is incorrect.

Choicepoint returned forms to Equifax four separate times. in response to Equifax's requests that it compare the identity information listed in Equifax's credit file with the identity information listed on the documents filed in the New Mexico bankruptcy court. *See*, Exhibit 4, Mr. Klaer deposition, 91:2-6. Each time Choicepoint reported that the bankruptcy documents showed a name and address **different from** the information that Equifax had listed in its credit

file. *Id.* at 71:4-22, 77:25, 78:1-11, 85:9-18, 88:3-10. Each time, Choicepoint reported that the bankruptcy court records showed that a joint bankruptcy with Gilbert Apodaca.[5] *Klaer, id.* at 73:19-25, 78:12-19, 85:19-25, 86:1-2, 88:11-15.

Choicepoint did not decide or even flag for Equifax whether the identify information it returned was different or the same as the information that Equifax had in its file. *Klaer, id.* at 72:8-25. *See also,* Exhibit 1, Fluellen deposition, 243:13-25, 244:1-14. Rather, Equifax's outsource agent made the decision whether to delete or verify the bankruptcy as belonging to Ms. Apodaca. *Fluellen, id.* at 226:3-9.

### E.   It is Not Material that Equifax Reported the Results of Its Investigations the Same Day It Completed the Investigations (Fact No. 23)

Equifax states that it provided Ms. Apodaca with the results of its investigations the same day it completed the investigations. *See,* Equifax's brief, p. 23. This fact is not material.

The FCRA requires credit reporting agencies to complete investigations in response to consumer disputes within 30 days of receipt of the dispute. 15 U.S.C. 1681i(a)(1)(A). This deadline can be extended up to 15 more days if the consumer provides additional information or sends additional supporting documents. 15 U.S.C. 1681i(a)(1)(B).

In the dispute that the parties have termed "Dispute 2," Equifax failed to meet this deadline for reporting the results of the dispute. Equifax's internal documents show August 6, 2003 as the "date received." *See,* Exhibit 5, EFX0095. Equifax then verified the bankruptcy as belonging to Ms. Apodaca in a credit report it sent to her on November 6, 2003, *92 days after Equifax had received this dispute. See,* Exhibit 8, Ms. Krauth deposition, 47:16-23.

_____

[5] Vicky Lopez Apodaca's husband is named Gilbert F. Apodaca. *See,* Exhibit 2, Vicky Lopez Apodaca deposition, 5:24-25. Plaintiff's husband is Larry Apodaca. See Exhibit 15, Victoria Apodaca deposition. 5:18-19.

Equifax identifies "Dispute 2" with case number 321830925. *Id.* On August 14, 2003, Ms. Apodaca sent to Equifax official documents from the U.S. Bankruptcy Court -- District of New Mexico. The connection with "Dispute 2" is shown by the case number listed on her fax cover sheet. Ms. Apodaca sent Form 20 from this very court's bankruptcy division. The results of the search are reported in a section at the bottom of the page, called "Certificate of Search." *See*, Court's website, "Court Forms," http://www.nmcourt.fed.us/web/BCDOCS/Files/forms.htm (listed as "Certificate of Search (Form 20)"). This document is signed by a court clerk. It clearly indicates that the Court did not show any bankruptcy records for "Victoria Apodaca" of "Moriarty, NM" with a social security number ending "2469."

The second document is a copy of this court's docket sheet. It clearly shows the bankruptcy in question was filed by "Vicky L. Apodaca" of "Las Cruces, NM" with a social security number ending "2649." *See*, Exhibit 7, fax cover sheets and documents.

The August 14 fax was received by Beverly LeBlanc, an Equifax outsource agent located in New Brunswick, Canada. *See*, Exhibit 8, Ms. Krauth deposition, 38:3-24. Despite the fact that Ms. Apodaca had marked the fax "urgent," the fax sat in Canada for 15 days. The Canadian outsource agent did not forward the fax to Nancy Krauth, an Equifax employee in Atlanta, until August 29, 2003. *See*, Exhibit 7, fax cover sheets and documents (fax tagline dated "Aug 29 2003" despite fax cover sheet being dated "Aug. 28/03"). Equifax cannot explain why it sat in Canada for two weeks. *See*, Exhibit 8, Ms. Krauth deposition, 39:17-25; Exhibit 33, Beverly LeBlanc deposition, 33:11-20. Ms. Krauth determined the documents from the New Mexico bankruptcy court were "not needed." *See*, Exhibit 9, EFX119; Exhibit 8, Ms. Krauth deposition, 54:22-25, 55:1-19. Equifax then verified the bankruptcy as belonging to Ms. Apodaca in a credit report it sent to her on November 6, 2003, *92 days after Equifax had received this dispute. See.*

8

Exhibit 8, Ms. Krauth deposition, 47:16-23.

**F.    Many Courts Have Found that Credit Reporting Agencies Violate the FCRA Using the CDV Procedure in Consumer Disputes (Fact No. 26)**

In the guise of a "fact," Equifax argues that "No court has found the CDV procedure to be unreasonable." *See*, Equifax's brief, p. 6.  This claim is a gross misstatement.

Credit reporting agencies can use the CDV procedure adequately in some disputes.  With other disputes, the CDV procedure is not reasonable. *See, infra*, § III(B).  The real issue is not the name of the procedure used but whether the procedure was reasonably adapted to the dispute at hand.  Ms. Apodaca cites numerous cases, including cases against Equifax, where courts found that the use of a CDV procedure was not reasonable under the circumstances of the case.

**G.    18 State Attorneys General and the FTC Have Found Equifax's "Partial Matching Logic" to Be Unreasonable (Fact No. 31)**

In the guise of "fact" – when it is an issue of law – Equifax asserts that "no agency . . . has found Equifax's 'seven for nine' matching logic to be unreasonable." *See*, Equifax's brief, p. 31.  This claim is misleading.[6]

In 1992, Equifax entered into a Consent Agreement with 18 state attorneys general, including New Mexico's Attorney General.  This order directly addressed Equifax's partial matching logic system in the context of mixed file disputes.  This order required Equifax to begin using "Full Identifying Information" "to prevent the occurrence or recurrence of mixed files."  "Full Identifying Information" was defined as "full last name and first name; middle initial; full street address; zip code; year of birth; any generational designation; or social security number."

---

[6]  Its partial matching logic lets Equifax report "Maria Vicky Lopez Apodaca" as the same person as "Victoria Apodaca."  Its partial matching logic allows Equifax to report that a social security number ending in "2469" is the same as a social security number ending "2649." if the other numbers match.  (Equifax calls this a "seven for nine' matching logic.")

*See,* Exhibit 10, Consent Agreement.

Likewise, a 1994 Federal Trade Commission Order addressed Equifax's methodology of matching credit data to a particular consumer.[7] *See,* Exhibit 11, FTC Order.

## H.    The 2004 FTC Report Does Not Advocate Partial Matching Logic (Fact No. 32)

In the guise of a "fact," Equifax argues that the 2004 FTC Report to Congress advocates in favor of a seven for nine matching logic in building credit files." *See,* Equifax's brief, p. 6.

Equifax misleads this Court. The Federal Trade Commission makes no such conclusion in its report. Equifax omits this portion from the excerpt that it provided to the Court as Exhibit C to its brief. Worse, Equifax fails to inform this Court that ***the FTC finds that credit reporting agencies would not mix files if they used "full matching logic."***

Congress issued a directive to the FTC as part of a proposed amendment to current law, that could require credit reporting agencies to use a system "requiring an 'exact match' on name, SSN [social security number], address, and zip code." *See,* Exhibit 12, FTC report, p. ii and 36. In discussing an exact match matching logic system, ala the 1992 consent order, the FTC states:

> The report concludes that, if the proposed matching requirement were imposed on the matching process for file building, there would likely be a reduction in "mixed files" because data would be less likely to be assigned to the wrong file.

*Id.* at iv. It acknowledges that the adoption of "Full Identifying Information" matching logic "would likely reduce the creation of new mixed files to almost zero." *Id.* at 50. On the other hand, the FTC states:

---

[7] The 1994 FTC Order contained a provision similar to those contained in the state attorneys general order. It required Equifax to match at least two identifiers to verify an account as belonging to a particular person:

> To prevent reporting to Subscribers that Credit Information pertains to a particular Consumer unless Equifax has identified such information by ***at least two*** of the following identifiers: (i) the Consumer's name; (ii) . . . SSN [social security number]; (iii) . . . date of birth; (iv) the Consumer's account number with a Subscriber or a similar identifier unique to the Consumer . . . .

At the same time, because the data provided by furnishers is imperfect and unlikely to allow precise matching, the proposal also would likely lead to more "fragmented files." If this occurred, credit reports would be less informative and the costs of credit could increase substantially.

*Id.* at iv. "Based on the findings and conclusions of these studies, **the Commission is not making legislative or administrative recommendations at this time.**" *Id.* at vii.

## I.   Identity Theft Disputes – a Subset of Mixed File Disputes – Were the Primary Consideration in the Passage of the FACT Act (Fact No. 33)

In the guise of a "fact," Equifax argues that "the subject of mixed files was not even addressed in the proposed amendments to the recently enacted "FACT ACT."" *See,* Equifax's brief, p. 6. This claim is misleading.

The FACT Act was passed December 4, 2003, by Congress in response to the identity theft epidemic and to the difficulty consumers face getting credit reporting agencies adequately to respond to their disputes involving identity theft. Although the term "mixed files" does not appear in the Act, the Act deals extensively with the mixed file problem, because identity theft disputes are a subset of mixed file disputes.

Evan Hendricks, Ms. Apodaca's expert, testified before Congress in connection with the formulation and passage of the FACT Act. He explains that "Identity theft is a sub-category of the more general category of Mixed Files, as the imposter-generated fraudulent activity is mixed into the consumer report of the innocent victim." *See,* Exhibit 13, Mr. Hendrick's report, p. 9. In both situations, the victim tries to separate the accounts not belonging to him from the accounts that do. With both, the credit reporting agency must examine the identifiers it used for the two people, in order to separate the accounts into two distinct files. The primary difference between the mixed file cases and identity theft cases is their cause. With a mixed file, like Ms. Apodaca's, the credit reporting agency caused the files to be mixed, usually by problems in its

11

matching logic. Where there is identity theft, the imposter initially causes the files to be mixed.

**J.      The FACT Act Actually Contemplates Changes to Matching Logic (Fact No. 34)**

In the guise of a "fact," Equifax argues that the FACT Act imposed no changes on credit reporting agencies' matching programs. *See*, Equifax's brief, p. 7. This statement is a half-truth.

In the FACT Act, Congress directed that the FTC study "the effects of requiring CRAs [credit reporting agencies] to match more points of identifying information (e.g., name, social security number, address) to ensure that a consumer is the correct individual to whom a credit report relates." The FTC has not yet issued any recommendations, but the FACT Act ultimately may force Equifax to change its matching logic, especially where a consumer dispute arises that concerns the identity of the account holder.

**K.      Ms. Apodaca's Disputes Began in June, Not July, 2003 (Fact No. 37)**

Equifax incorrectly states that Ms. Apodaca's disputes began in "July of 2003." Ms. Apodaca sent the first of many dispute letters to Equifax June 26, 2003 (Exhibit 14), stating:

> One Victoria Lopez Apodaca social security number [redacted]-2649 credit history has been appearing on my credit report. My name is Victoria Apodaca social security number [redacted]-2469. As you can see the 4 & 6 are inverted and with our names being so similar it has caused some problems for me.

**L.      Ms. Apodaca Sent Bankruptcy Court Documents to Equifax at Least Four Times in August, 2003, Plus Once in October, 2003 and Again in April, 2004 (Fact No. 41)**

Equifax claims that Ms. Apodaca only "sent bankruptcy records to Equifax two times in August 2003." *See*, Equifax's brief, p. 7. Equifax is wrong.

In August, 2003, Ms. Apodaca faxed Form 20, the United States Bankruptcy Court's "Certificate of Search." It that showed she had never declared bankruptcy. She also faxed the court's docket sheet, that showed that "Vicky L. Apodaca" of "Las Cruces, NM" with a different

social security was the person who declared bankruptcy. **She faxed these items to Equifax 4 times that month: on August 11, August 12, August 14 and on August 18.** She remembers faxing these documents the day she picked them up from the court on August 11. *See*, Exhibit 15, Ms. Apodaca's deposition, 36:17-25, 37:1-2. She kept records that prove she faxed these documents at least three more times in August. *See*, Exhibits 6, 7, and 16.

Ms. Apodaca talked to four successive "supervisors" about whether Equifax had received these documents. Each person told her to re-fax them because Equifax had not yet received the documents. Exhibit 15, 37:12-25, 38:1-6. Furthermore, she mailed these same documents to Equifax on October 9, 2003, and again on April 2, 2004. *See*, Exhibit 17, letters.

## M. Equifax Presents No Evidence that It Directly Contacted the Bankruptcy Court Concerning the Validity of the Bankruptcy Court Documents that Ms. Apodaca Sent (Fact No. 42)

Equifax claims that in response to the first time it received the bankruptcy court documents, it "made a decision to contact Choicepoint, the public records vendor, who in turn contacted the bankruptcy court in Albuquerque." *See*, Equifax's brief, p. 7.

To the extent that this statement suggests that Equifax tried to verify the validity of the Form 20 and docket sheet, this statement is misleading, because Equifax did nothing to verify their validity. Equifax disregarded those documents.

The only Equifax agents who had contact with the bankruptcy documents are Ms. LeBlanc, an outsource agent in Canada, and Ms. Krauth, an Equifax employee in Atlanta.[8] Ms. Krauth claims that she "wrote to the court because the search was not an acceptable document" –

---

[8] Ms LeBlanc's treatment of the bankruptcy court documents was to hang onto them for 15 days, then fax them to Ms. Krauth, with the question: "Attached are Bankruptcy Search Docs. Are we authorized to accept these?" Ms. Krauth's response    recorded into Equifax's automated system on September 8, 2003 – was to determine that the documents were "not needed." *See*, Exhibit 9, EFX119; Exhibit 8, Ms. Krauth deposition, 54:22-25, 55:1-19.

also on September 8. She does not explain why she "wrote to the court" if she had already

determined that these documents were "not needed." *See*, Exhibit 8, Ms. Krauth deposition,

44:4-12. Ms. Krauth claims she received a written response from the Court on September 18,

2003. *Id.* at 44:20-25.  Equifax has never produced a copy of Ms. Krauth's supposed letter to

the Bankruptcy Court or its supposed response.  A jury should consider the absence of the letters

and draw its own conclusion about whether the Krauth testimony is false.

Choicepoint received a Bankruptcy Court records search request from Equifax on

September 9, 2003, and returned it on September 17, 2003. *See*, Exhibit 4, Mr. Klaer deposition,

76:19-25, 77:1-4. Choicepoint did not verify the "Certificate of Search" with the Court.

Choicepoint never reviews supporting documents forwarded from Equifax in connection with a

consumer dispute. *Id.* at 53:18-25, 54:1-15. The Choicepoint representative testified that the

"Certificate of Search" would have been helpful to Choicepoint in responding to the search

request from Equifax, ***but Equifax never sent it to Choicepoint to verify.*** *Id.* at 81:8-20.

### N.    Ms. Apodaca Disputes that the Bankruptcy Documents Were Illegible (Fact No. 43)

Equifax claims that, in response to the second time it received from Ms. Apodaca the

Bankruptcy Court documents, it determined that "the documents were illegible" and therefore the

the Equifax operator decided to "contact the source of information to determine whether the

bankruptcy belonged to Plaintiff." *See*, Equifax's brief, p. 8.

First, Equifax did nothing to verify the genuineness of the Form 20 and docket sheet.

Second, the testimony of the Equifax agents is so lacking in credibility that the jury will

have to make its own decision. Equifax produced some documents it admits receiving. *See*,

Exhibit 7, fax cover sheets and documents. These documents are plainly legible enough to

determine that the bankruptcy did not belong to "Victoria Apodaca" of Moriarty. New Mexico.

with a social security number ending in "2469" but instead belonged to a "Vicky [middle initial

illegible] Apodaca" of Las Cruces, New Mexico, with a social security number ending in "2649."

Ms. Krauth claims that the bankruptcy court documents she received were illegible.

However, she could not explain why her notes in Equifax's system say that the documents were

"not needed," instead of "not legible." *See*, Exhibit 8, Ms. Krauth deposition, 57:5-11.

Equifax cannot state whether the documents were legible at the time that it received them.

*See*, A, Ms. Fluellen deposition, 166:12-20. Equifax could have caused the documents to

become less legible when it scanned the documents into its system.

The bankruptcy court documents that Equifax produced in connection with the October 9

letter (Exhibit 20, EFX21-23) are legible enough to determine that the bankruptcy belonged to

"Vicky L. Apodaca" of Las Cruces, New Mexico, social security number ending in "2649."

**O.    The Wells Fargo Card Was Not Sought for a Business (Fact No. 47)**

Equifax claims that the Wells Fargo credit card "was for Plaintiff's husband [sic]

automotive repair business." *See*, Equifax's brief, p. 8. This statement is not accurate.

The Wells Fargo credit card application was in the name of "Victoria Apodaca." The

application did not mention any auto repair business. *See*, Exhibit 19, Ms. Daniel deposition,

17:10-18. Moreover, Wells Fargo considered the application an application for a consumer

credit card. It declined the application for the given reason "consumer has bankruptcy on his/her

credit bureau." It based this decision solely on a credit report provided by Equifax that showed a

bankruptcy. *See*, *id.* at 18:25, 19:1-8.

Although Ms. Apodaca did intend to use the card in part for expenses related to her

husband's auto repair business, she sought a personal credit card for household use. She also

sought a card that would be issued in her name only. *See*, Exhibit 21, Victoria Apodaca affidavit.

III.  **The Jury Reasonably Could Conclude that Equifax Acted in Conscious Disregard of Ms. Apodaca's Rights and Thus Award Punitive Damages**

Equifax does not dispute that Ms. Apodaca presents sufficient facts to allow the jury to decide whether it violated § 1681i and § 1681e(b). Rather, Equifax argues that the facts of Ms. Apodaca's case do not allow for an award of punitive damages as a matter of law.

In this case Ms. Apodaca practically did all the work that Equifax should have needed. She told them in her first letter the name and social security number of the person whose derogatory credit entries appeared on her report. Over the next year she sent letter after letter, explaining to Equifax who she was (name, address, social security number, date of birth, etc.) and how Maria Vicky Lopez Apodaca was a completely different person. See Exhibits 6, 7, 14, 16, 17, and 20.

Equifax sets up two straw arguments when it mischaracterizes plaintiff's case. On page 9 of its brief Equifax alleges that plaintiff's "two main allegations" are that the use of a "CDV system" is unreasonable and that its matching logic does not assure maximum possible accuracy. Equifax grossly distorts plaintiff's arguments.

Plaintiff will present below numerous grounds for the Court to hold that Equifax's actions were willful and showed "reckless disregard" of Ms. Apodaca's rights.

Plaintiff does not claim that a CDV system is unreasonable per se. Plaintiff will show that Equifax failed to conduct a reasonable reinvestigation in her case, for her particular dispute.

Plaintiff does not argue that Equifax's matching logic cannot insure maximum possible accuracy for some consumers, but it failed completely in this mixed-file situation. Even worse,

Equifax's duplicity in refusing to honor its agreements, with the New Mexico Attorney General (and 17 others) and with the Federal Trade Commission, establish the willfulness to allow the jury to award punitive damages here.

**A.     The Reasonableness of Using Only a CDV Process to Investigate a Dispute Depends on the Situation**

Equifax argues that the "CDV procedure alone is accepted by courts as an adequate method both for assuring accuracy and for reinvestigations." *See*, Equifax's brief, p. 11. This statement is wildly misleading. Equifax's argument is akin to an employer in a wrongful termination suit arguing that, if an employer has a progressive discipline policy on paper, it could never have wrongfully fired an employee. The real issue is not the label for the system or the policy manuals that Equifax produces as window dressing. The issue is whether the reinvestigation procedure was reasonable in this case.

**1.     How Equifax's Automated CDV System Operates**

The CDV system is the automated dispute system used by Equifax. The abbreviation "CDV" means "consumer dispute verification."

An Equifax agent reads the consumer's letter or talks to the consumer on the telephone. A few of these agents actually work for Equifax. Most of the agents work for companies to whom Equifax has "outsourced" their duty to reinvestigate. In 1999, Equifax began to "outsource" a large part of its consumer dispute operation to Jamaica and the Philippines. Equifax admits one of the reasons it outsourced was to cut costs. *See*, Exhibit 1, Ms. Fluellen deposition, 57:8-15, 58:1-6, 59:11-13.

Ms. Apodaca's disputes involved 20 agents in four countries (United States. Canada, Jamaica and Costa Rica). *See*, Exhibit 25, supplemental discovery responses. As shown below.

this clumsy structure caused severe problems.  Different agents did not have access to each other, or to documents concerning Ms. Apodaca's disputes.  *See*, *infra*, § III(C), (D) and (E).  This process is like taking your car to the mechanic and having 20 different people work on it separately, several of whom work on the same part.

The agents summarize the entire dispute into a three digit code.  For example, in this case Equifax reduced all the information contained in Ms. Apodaca's dispute letters and all her supporting documents to code 002, which means "belongs to another individual w/ same name." Equifax then transmits this code to the company which had furnished the credit information that the consumer disputes.  This source company is called the "furnisher."  Equifax sends the coded dispute in a CDV form.

The furnisher responds in most cases by checking one of three boxes: "verify as reported," "change data as shown" or "delete account."  Equifax also asks the furnisher to indicate whether the identifying information[9] in its records is the same as the identifying information that Equifax has in consumer's credit file.  The furnisher can check a box labeled "same" beside each such item.  *See*, Exhibit 23, CDV form.  The furnisher then sends the CDV form back to Equifax.

Sometimes this CDV form is a paper form.  Other times it is transmitted electonically, by computer (the "ACDV" form, or "automated consumer dispute verification").

Equifax's agent then checks whether at least two pieces of identifying data reported by the furnisher match the information in Equifax's consumer credit file.  *See*, Exhibit 30, Cynthia Shaw deposition, 9:11-10:2.

Equifax has structured its CDV system to be complex and disjointed.  It is the cheapest

---

[9]  name, address, prior address. social security number, date of birth, phone, spouse.

way possible to collect information, and it completely fails in cases like this one, which require a human being to take charge of an investigation, to engage in thought, to carry out a formal inquiry, and to make sound decisions.

## 2.    Courts Often Have Ruled the CDV System Is Unreasonable

A single court has held that the CDV system is reasonable for *a certain type of dispute* under the particular facts of that case. In *Quinn v. Experian Solutions*, No. 02-C-5908, 2004 U.S. Dist. LEXIS 4812 at *11 (N.D. Ill. Mar. 24, 2004), the court held the CDV process was reasonable "[g]iven the terse dispute [the plaintiff] sent to Equifax." This situation differs greatly from the specific and detailed information and supporting documents Ms. Apodaca provided Equifax. *See*, Exhibit 7.

No courts have held that Equifax's application of the CDV system is reasonable as a matter of law under any and all facts. Many courts have held that a defendant's particular application of the CDV system could be unreasonable. In *Stevenson v. TRW, Inc.*, 987 F.2d 288 (5th Cir. 1998), the Fifth Circuit considered a case similar to Ms. Apodaca's case. The consumer disputed multiple accounts as belonging to another person with a similar name. *Id.* at 291. The Fifth Circuit affirmed the trial court's verdict (reached by bench trial) that the credit reporting agency violated the FCRA because it relied only on its CDV system, at 293 (citations omitted):

> Additionally, in spite of the complexity of [the plaintiff's] dispute, [the credit reporting agency] contacted the subscribers only through the CDVs . . . [The credit reporting agency] relied solely on the CDVs despite the number of disputed accounts and the allegations of fraud.

See also, *Johnson v. MBNA America Bank, NA*, 375 F.3d 426, 430 (4th Cir. 2004) (rejecting the defendant's argument that the FCRA investigation provision "does not contain any qualitative component that would allow courts or juries to assess whether the creditor's investigation was

reasonable"); *Cushman v. Trans Union Corporation*, 115 F.3d 200, 220 (3rd Cir. 1997); *Acton v. Bank One Corporation*, 293 F.Supp.2d 1092, 1099 (D. Az. 2003) ("the reasonableness of Equifax's procedures is a question for the jury to decide"); *Ruffin-Thompkins v. Experian Information Systems, Inc.*, No. 03-C-683, 2003 U.S. Dist. LEXIS 23647 (N.D. Ill. Jan. 2, 2004) (noting credit reporting agencies are not excused "from independently verifying information provided by the creditors" if "the agencies have prior knowledge that the information might be inaccurate"); *Lee v. Experian Information Solutions*, No. 02-C-8424, 2003 U.S. Dist. LEXIS 17420 at *23, n.11 (N.D. Ill. Oct. 2, 2003) (noting that its holding "does not of course negate the existence of a duty to conduct an independent investigation" where the facts reasonably require more than a CDV exchange); *Evantash v. G.E. Capital Mortgage Services, Inc.*, No. 02-CV-1188, 2003 U.S. Dist. LEXIS 23131 at *15 (E.D. Pa. Nov. 25, 2003) ("Despite the inconsistencies in [the furnisher's] reporting, [the credit reporting agency] failed to further inquire about the status of the Account . . . That alone provides a basis from which a jury could infer that [the credit reporting agency's] procedures were unreasonable"); *Jensen v. Peoples Gas Light and Coke Company*, No. 04-C-2945, 2005 U.S. Dist. LEXIS 17445 (N.D. Ill. Aug. 16, 2005) (the CDV system could lead to FCRA violations if the CDVs contain inaccurate identifier information); *Bryant v. TRW, Inc.*, 689 F.2d 72, 77 (6th Cir. 1982) (where a credit reporting agency possessed independent information about whether disputed information was correct, simply verifying that information with the source was not reasonable); *Sampson v. Equifax Information Services, LLC*, No. 204-CV-187, 2005 U.S. Dist. LEXIS 19240 (S.D. Ga. Aug. 29, 2005); *Graham v. CSC Credit Services, Inc.*, 306 F.Supp.2d 873 (D. Minn. 2004); *Betts v. Equifax Credit Information Services, Inc.*, 245 F.Supp.2d 1130, 1135 (W.D. Wash. 2003); *Crane v. Trans Union, LLC*, 282 F.Supp.2d 311 (E.D. Pa. 2003).

*Kirkpatrick* was a case involving Equifax's application of the CDV system to another consumer who, like Ms. Apodaca, repeatedly gave Equifax documentary proof that multiple accounts belonged to someone else. That jury found Equifax's CDV system was unreasonable.

**3.    Credit Reporting Agencies Sometimes Must Go Beyond the Verification of Identifier Information with the Furnisher**

Equifax cannot always end its investigation with the sending and recording of responses to CDVs. Many situations – like Ms. Apodaca's disputes – require more thought and effort in order to comprise a reasonable investigation.

In *Cushman,* 115 F.3d 220, the Third Circuit addressed this issue where the consumer provides the credit reporting agency information and documents. It held that the credit reporting agency often will be required to conduct an investigation *beyond* an exchange of CDVs. Most importantly, it held that the jury decides whether the credit reporting agency conducted the investigation properly under the law and thus whether its failure was willful.

> We hold that in order to fulfill its obligations under § 1681i(a) a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial source of information. We further hold that whether the credit reporting agency has a duty to go beyond the original source will depend on a number of factors. One of these is whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable...A second factor is the cost of verifying the accuracy of the source ... ***Whatever considerations exist, it is for the trier of fact to weigh these factors in deciding whether the defendant violated the provisions of section 1681i.***

*Id.* at 225-26 (citations, quotations and editorial parenthesis omitted). The Third Circuit reasoned that this independent investigation would impose little cost on the credit reporting agencies if the investigations were done in response to consumer disputes where the consumer provide the credit reporting agency with the relevant facts and documents.

> [O]nce a claimed inaccuracy is pinpointed, a consumer reporting agency conducting further investigation incurs only the cost of reinvestigating that one

piece of disputed information. In short, when one goes from the § 1681e(b) investigation to the § 1681i(a) investigation, the likelihood that the cost-benefit analysis will shift in favor of the consumer increases markedly.

*Id.* at 225. The *Cushman* court held that with many disputes, the purpose of the FCRA would be defeated if credit reporting agencies only asked furnishers to verify the identifier information on the account and the way the furnisher reported the account.

The FCRA evinces Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear "grave responsibilities," 15 U.S.C. § 1681(a)(4), to ensure the accuracy of that information. *The "grave responsibility" imposed by § 1681i(a) must consist of something more than parroting information received from other sources.*

**C.   Equifax's Refusal to Alter Its Partial Matching Logic, After (1) Notice that Its Partial Matching Logic Causes It to Report Inaccurate Credit Data, and (2) It was Ordered to Change Its System, Constitutes Willful Misconduct that Entitles Plaintiff to Seek Punitive Damages**

Equifax could have resolved Ms. Apodaca's disputes, and resolved them quickly, if Equifax had not continued to rely on partial matching logic *even after* Ms. Apodaca showed it the similarity between her name and her social security number and Maria Vicky Lopez Apodaca's name and social security number.

The plaintiff gave Equifax all the information it needed about these two files being mixed. Credit reporting expert Evan Hendricks explains how Equifax acted willfully. Once notified of the differences in the name, social security number and other personal identifiers of the two women, Equifax failed to act. Equifax knew that it would continue wrongly to report accounts not belonging to Ms. Apodaca on her credit report, unless it required more precise matching logic concerning her credit data. *See,* Exhibit 13, Hendricks report, pp. 3-4, 9-12; Exhibit 26, Hendricks' supplemental report, pp. 2-5. In Exhibit 26, at 3-4, Mr. Hendricks states:

In the case of Mrs. Apodaca and other victims of credit report inaccuracy caused

22

by Mixed Files or identity theft, one of Equifax's most critical shortcomings is that it did not adjust towards a more exact matching criteria after it knew or should have known that partial matching logic was the cause of inaccuracy.

The 1992 state Attorneys General Agreement (followed by the 1994 Federal Trade Commission Consent Order) notified Equifax that its partial matching logic prevented it from reasonably resolving mixed file disputes. In both these orders, Equifax pledged to use "Full Identifying Information" in dealing with mixed file disputes. See Exhibits J and K.

Equifax has testified in this case that it has not made any changes to its partial matching logic system since 1991. See, Exhibit AA, Ms. Dorman deposition, 45:13-22. It has not reformed its partial matching logic system as applied to mixed files as a result of this lawsuit or as a result of the 34 mixed file lawsuits it faced before Ms. Apodaca's case. See, id. at 46:3-12; Exhibit 29, supplemental discovery responses.

Ms. Apodaca's disputes show that Equifax did not use "Full Identifying Information" once it received notice that it had mixed a consumer's file with the file of another. Here is a comparison of the "Full Identifying Information."

|  | Plaintiff | Other person |
|---|---|---|
| name | Victoria Apodaca | Maria Vicky Lopez Apodaca |
| address | PO Box 1423<br>11 William Ranch Road<br>Moriarty, New Mexico 87035 | 517 East Lucero Avenue<br>Las Cruces, New Mexico 88001 |
| date of birth | November 19, 1954 | July 20, 1951 |
| social security number | . . . 2469 | . . . 2649 |
| spouse | Larry Apodaca | Gilbert F. Apodaca |

Every person has a unique nine digit social security number. However, Equifax considers social security numbers to match if seven out of the nine digits match and there are two other digits that are transposed. Equifax also considered the two persons to be identical because they

shared the same name ("Victoria" is considered the same as "Vicky"). Lastly Equifax believed they were the same person because they lived in the same state (the fifth largest state in the nation, where they live in cities 274 miles apart). Under Equifax's system, the credit information for both individuals was reported in the same file. *See*, Exhibit 27, Ms. Dorman deposition, 12:21-25, 13:1-12.

Equifax's conduct is inexcusable, flouting the State Attorneys General and FTC Consent Order. But its conduct after the files were mixed was even worse. Ms. Apodaca gave Equifax every chance to correct its error, which had damaged her credit and prevented her from obtaining a mortgage for a house for her son. Equifax admits there were 8 disputes spanning almost an entire year. She provided Equifax with letters that explained the similarities between her name and social security number and the name and social security number of the person with whom Equifax mixed her file.

Yet Equifax continued to employ partial matching logic. By doing so, it caused accounts to be verified when they should have been deleted, and it delayed the resolution of the dispute for a year. For example, when processing the CDV forms disputing the bankruptcy, three times Equifax considered the two Ms. Apodacas to be the same person ***despite the CDV form itself showing that the two names did not match and the two addresses were completely different***. *See*, Exhibit A, Ms. Fluellen deposition, 230:17-25.

At the time that Ms. Apodaca filed this lawsuit, Equifax still reported a Discover credit card as "included in bankruptcy" despite Ms. Apodaca having disputed this account three times. Months after Ms. Apodaca had filed the lawsuit, Equifax's credit report for Ms. Apodaca still contained accounts belonging to Vicky Lopez Apodaca. *See*, Exhibit 28, credit report; Exhibit 2, Vicky Lopez Apodaca deposition, 6:25, 7:1-2,21-23, 8:2-6.

The jury could reasonably conclude that Equifax's continued use of partial matching

logic, after (1) ignoring two orders it signed, and (2) receiving notice that this logic is damaging a

consumer, shows a conscious disregard of consumers' rights under the FCRA thereby justifying

punitive damages.[10]

### D.    Equifax Recklessly Disregarded Documents Provided By Plaintiff

A credit reporting agency may not disregard information and documents provided by the

disputing consumer. A credit reporting agency has willfully violated the FCRA when it

"knowingly and intentionally commits an act in conscious disregard for the rights of others." See

Cousin, 246 F.3d at 372." Comeaux v. Experian Information Solutions, No. 2:02-CV-304, 2004

U.S. Dist. LEXIS 10705 at *29-30 (E.D. Tex. June 8, 2004). The Court in Comeaux found the

plaintiff had demonstrated willfulness sufficient to proceed to trial, where the credit reporting

agency had disregarded the discrepancies and inaccuracies, despite being notified by the

consumer.

A court may award punitive damages under the FCRA against a credit reporting agency

that refused to correct its inaccurate reporting of public records despite "the fact that the plaintiff

constantly called that error to the attention of the defendant." In Nitti v. Credit Bureau of

Rochester, Inc., 375 N.Y.S.2d 817, 822 *11-12 (emphasis added), 1975 N.Y. Misc. LEXIS 3122

---

[10] In reply, Equifax may cite Country Vanline Inc. v. Experian Information Solutions, Inc., 317 F.Supp.2d 383 (S.D. N.Y. 2004), for the proposition that a plaintiff injured by partial matching logic cannot maintain a claim for punitive damages based on the use of partial matching logic. Country Vanline is not an FCRA case; it is a commercial defamation action. The malice standard for defamation is much higher than the willfulness standard for FCRA punitive damages. See, infra, III(A). In Country Vanline, a corporation sued the credit reporting agency for providing a bank with a credit report for a corporation formerly operated by the same person that operated the new business, at the same address and phone number. The new corporation claimed the credit reporting agency should have only provided the credit report for that corporation and not for the old corporation. Id. at 386-87. The plaintiff in Country Vanline did not request the credit reporting agency to investigate any specific accounts. Here it is undisputed that Equifax reported accounts on Ms. Apodaca's credit report that truly did not belong to her and continued to report these derogatory accounts for a year, even after it received information and documents that made clear that the accounts were not her accounts.

at *11 (Monroe County Supreme Court, New York Nov. 26, 1975), the court described the

extreme frustration which Ms. Apodaca, too, felt when her pleas to reinvestigate fell on deaf ears.

> ***Time and again*** plaintiff came to the defendant's office and went over the
> same credit information with the defendant's employees, pointing out the errors,
> all to no purpose. Time and again he tried to have the defendant update and
> correct its report of him; he pleaded, he lost his temper, all to no avail. ***Like a***
> ***character in Kafka, he was totally powerless to move or penetrate the***
> ***implacable presence*** brooding, like some stone moloch, within the castle.
> It was this very kind of contumacious conduct that Congress sought to
> correct. It recognized that to do so, it must be necessary to cause and, if need be,
> to coerce a change in the defendant's operations in order to make it comply with
> the law. ***Congress intended to make it expensive for the defendant not to***
> ***comply. This was the purpose of assessing, without limitation, punitive***
> ***damages.***

In another strikingly similar case, *Soghomonian v. United States, et al.*, 278 F.Supp.2d

1151 (E.D. Ca. 2003), a federal district court rejected a defense nearly identical to that raised by

Equifax here. It held that the plaintiffs had raised a claim for punitive damages under 15 USC §§

1681e(b) and 1681i. The plaintiffs disputed tax liens that appeared on their Trans Union credit

reports. In connection with these disputes, the plaintiffs provided Trans Union, the credit

reporting agency, with copies of IRS documents that showed the tax liens were invalid. *Id.* at

1154, 55. Trans Union argued that its failure to remove the liens for months was reasonable.

The Court rejected Trans Union's claim that it could reject the IRS documents that

plaintiff sent because their "nature and physical appearance" were "unusual." *Id.* at 1156. This

conduct is exactly the conduct of Equifax in rejecting Form 20, from the Bankruptcy Division of

this very court, which Ms. Apodaca faxed to Equifax repeatedly. The Soghomonium court held,

at 1161:

> Thus, it appears that nobody conducted a sufficient review of the facts upon which
> the tax lien portion of the credit report was based, notwithstanding the fact that
> Plaintiffs supplied Trans Union the very information it arguably might have
> needed to do so. All this was contrary to the FCRA. In this circumstance, the fact

that Trans Union took literally months to delete the tax liens entries on Plaintiffs' credit reports *could well lead a reasonable jury to conclude that Trans Union's actions were willful*; Trans Union's justifications for not acting sooner simply are not persuasive, or a reasonable jury could so believe.

The court also rejected Trans Union's attempt to blame the furnisher of the tax lien information, to which it sent CDVs. *Id.* at 1157, n.3. It shifted the legal responsibility back to the credit reporting agency, rather than letting it blame its contractor (just as Equifax wants to blame Choicepoint's information for its own failure to delete Ms. Apodaca's bankruptcy).

There is no FCRA exception to the reinvestigation requirement that automatically excuses a credit reporting agency from liability simply because the agency relies upon some other company to do the very thing the agency is required by law to do – i.e., reinvestigate and verify the status of the disputed information.

Here, Ms. Apodaca did Equifax's work and identified the very person with whom she was mixed. She provided Equifax with official documents from the New Mexico Bankruptcy Court that unequivocally showed the bankruptcy did not belong to her. Equifax ignored these letters and blindly charged ahead with its CDV process, employing partial matching logic.

The jury has the right to reject Equifax's excuses. Equifax argues that, the first time it received Form 20 from Ms. Apodaca, it did not recognize the documents and asked Choicepoint to verify the document. However, Choicepoint never received the actual documents from Equifax. Choicepoint told Equifax that the person who had declared bankrupcy had a different name and a completely different address that the person for whom Equifax was reporting the bankruptcy. Equifax blindly disregarded that information.

Equifax argues that, the second time it received the documents from Ms. Apodaca, it considered them illegible. The copies that Equifax produced from its own files, Exhibit 7, are legible enough to determine that the bankruptcy did not belong to "Victoria Apodaca" of Moriarty, New Mexico, social security number ending in "2469" but instead belonged to "Vicky

L. Apodaca" of Las Cruces, New Mexico, with a social security number ending in "2649."

At the very least, the evidence about Equifax's failure to consider the Bankruptcy Court documents is packed with factual disputes. The jury could reasonably reject Equifax's excuses for its failure to consider these documents, and it should award punitive damages.

### E.    Equifax Willfully Failed to Forward to the Furnishers All Relevant Information Provided by Ms. Apodaca

The FCRA specifies that Equifax "shall promptly provide" to the furnisher "all relevant information regarding the dispute that is received by the agency from the consumer...." 15 U.S.C. § 1681i(a)(2)(B). Equifax repeatedly violated this provision. Numerous federal courts have sent this issue to the jury to determine willfulness.

In *Crane v. Trans Union, LLC*, 282 F.Supp.2d 311, at 321 (E.D. Pa. 2003), the court held that summary judgment on punitive damages was not appropriate because the credit reporting agency had "testified that, when [it] sends a CDV to a creditor, it *never* includes the documentation a consumer provides." The *Crane* court held that because of this policy, "a reasonable jury could conclude that [the credit reporting agency's] refusal to transmit to [the furnisher] [the plaintiff's] supplemental document was either knowingly or recklessly in contravention of [the plaintiff's] FCRA rights." *See also, Lawrence v. Trans Union LLC*, 296 F.Supp.2d 582, 590 (E.D. Pa. Dec. 11, 2003) (fact that credit reporting agency "did not forward documentation to [the furnisher] that would have corrected [the plaintiff's] credit report" precluded summary judgment on punitive damages); *Graham v. CSC Credit Services, Inc.*, 306 F.Supp.2d 873, at 881 (D. Minn. 2004) (plaintiff raised an issue of material fact regarding whether he was entitled to punitive damages where furnisher's sworn testimony stated that if credit reporting agency had provided more information about nature of dispute, the furnisher

would have resolved the dispute).

Again in *Soghomonian*, 278 F.Supp.2d at 1157, n.3, the court faulted the credit reporting agency for its failure to send copies of the documents that the plaintiffs had provided to the public record vendor to which the credit reporting agency sent CDVs.

> Furthermore, the evidence in this case suggests that [the credit reporting agency] did not even bother to provide a copy of the [supporting documents] to [the public record vendor] when it asked [the public record vendor] to investigate and verify. If [the credit reporting agency] had provided a copy of the [supporting documents] to [the public record vendor], [the credit reporting agency's] reliance on [the public record vendor's] "verification" might have been more reasonable, or at least less unreasonable.

The *Soghomonian* court held that the plaintiffs presented a case for punitive damages, at 1161.

Equifax, as a matter of policy, does not provide consumer letters or supporting documents to furnishers, and it does not intend to change this part of its system. *See,* Exhibit A, Ms. Fluellen's deposition, 224:18-25, 225:1-13. By thumbing its nose at the explicit requirements of § 1681i(a)(2)(B), Equifax subjects itself to a jury finding of willfulness and punitive damages.

Equifax also refuses to send all the relevant information contained in the documents, when it sends its CDV to the person who supplied the disputed information. Equifax instructs its agents reduce the dispute to a three digit code. It is virtually impossible for that code to contain all the information contained in the actual documents. Equifax turned each of Ms. Apodaca's disputes about the bankruptcy into a three number code that meant "belongs to another individual w/ same name" or "not his/hers – provide complete identification." On the four CDVs that Equifax sent to Choicepoint, it told Choicepoint nothing more than that. *See,* Exhibit 4, Mr. Klaer's deposition, 70:24-25, 71: 1-3; 77:21-24, 84:11-23; 86:3-11. These CDV forms contain a free form text field, in which the Equifax agent could have provided more information besides the three-digit dispute code, but it did not . *See,* Exhibit A, Ms. Fluellen's deposition, 243:6-9.

Equifax never sends the actual documents to Choicepoint.  Klaer deposition, Exhibit 4, 53:18-54:15.  Choicepoint testified that Ms. Apodaca's letters would have put it on notice of the transposition of two numbers in the social security numbers.  *See*, Exhibit 4, Mr. Klaer's deposition, 70:24-25; Exhibit 14, letter; Exhibit 17, letters.  The jury could conclude that Equifax's system – which fails to communicate key information from the consumer's letters – merits the award of punitive damages.

### F.    Equifax Deliberately Does Not Perform an Independent Investigation Despite the Information and Documents Provided by Ms. Apodaca

The *Crane* court, 282 F.Supp.2d at 321, held that summary judgment on punitive damages was not appropriate because the credit reporting agency had "testified that [its] policy is to report whatever information creditors provide."  The court held that, in light of *Cushman*, "a reasonable jury could find that the [credit reporting agency's] failure [to] *independently analyze* [the plaintiff's] dispute constituted a knowing or reckless violation of the FCRA."

Equifax never actually investigated the validity of the "Certificate of Search."  It just sent a CDV to Choicepoint.  This CDV does not mention the documents provided by Ms. Apodaca. *See*, Exhibit 4, Mr. Klaer's deposition, 84:11-23.  It turns out that Choicepoint *never* reviews supporting documents forwarded from Equifax in connection with a consumer dispute.  *Id.* at 53:18 to 54:15.

Similarly, Equifax's outsource agents, who actually handle the disputes, do not investigate.  They simply enter the information provided by the creditor in response to any dispute.  *See*, Exhibit 24, Mr. Lawson deposition, 40:13-15.

The jury could reasonably conclude that Equifax's system involves nothing "more than parroting information received from other sources."  Under the holding in *Cushman*, it could

return a punitive damage award to ensure that Equifax makes substantial changes to its system.

### G.  Equifax Failed to Ensure that Adequately Trained Employees Handled Ms. Apodaca's Dispute

Punitive damages under the FCRA are appropriate where a credit reporting agency fails properly to train the employees that handle the dispute, failed properly to check the work of these employees and, as a result, these employees' actions adversely impact the plaintiff. *See, Jones v. Credit Bureau of Huntington, Inc.*, 399 S.E.2d 694, 702 (W. Va. 1990).

Here, Equifax testified that Ms. Apodaca identified her disputes as mixed file disputes. Thus, the disputes should have been handled by outsource agents specially trained in mixed files. *See*, Exhibit A, Ms. Fluellen deposition, 136:9-11, 138:2-5. Yet, the Jamaica outsource agents that handled Ms. Apodaca's disputes testified that they did not receive any specialized mixed file training. *See*, Exhibit 24, Miguel Lawson deposition, 5:19-23; Exhibit 30, Cynthia Shaw deposition, 5:8-17; Exhibit @@, Jermain Lewis deposition, 9:15-21. Based on this evidence, the jury reasonably could conclude that Equifax did not properly train or oversee its outsource agents and award punitive damages.

### H.  Equifax Has Withheld or Destroyed Evidence

In *Jensen*, 2005 U.S. Dist. LEXIS 17445, the court held that the reasonableness of the CDV exchange in question could not be determined where some CDVs were missing from the record. It held that the court was entitled to the inference that the missing CDVs contained incorrect identifier information, which could render the investigation unreasonable. *Id.* at *10.

#### 1.  Equifax Has Withheld the Bankruptcy Cleanup Section

The table of contents for Module Four of Equifax's FCRA Compliance Manual lists 11 subject headings. All these subject headings are in the text of Module Four, ***with the exception***

31

*of the last subject heading: "bankruptcy cleanup*." According to the table of contents, the

bankruptcy cleanup section begins on page 38. *Page 38 and any subsequent pages are missing*

*from the Module Four produced by Equifax.* (Exhibit omitted; confidential document).

The bankruptcy cleanup section lists the bankruptcy court documents which authorize

immediate changes to a credit file, without the need to send a CDV. See Exhibit 8, Ms. Krauth

deposition, 68:1-9. Ms. Apodaca repeatedly sent Equifax bankruptcy court documents – *official*

*forms from the New Mexico Bankruptcy Court* – that showed that the bankruptcy that Equifax

reported on her credit file belonged to another person. Equifax might list this form document as

acceptable proof of bankruptcy, but Equifax refuses to produce this section of its manual.

### 2.   Equifax Did Not Produce the April 2004 CDV It Sent to Discover

Ms. Apodaca disputed a Discover credit card account that appeared on her credit report as

"included in bankruptcy." She first disputed the Discover account in October 2003, but Equifax

continued to report the derogatory account, despite Ms. Apodaca providing clear proof to

Equifax that the account did not belong to her. *See*, Exhibit 32, CDV. In a letter dated April 2,

2004, Ms. Apodaca again disputed the Discover account. She explained in her dispute letter that

the Discover account "belong[s] to Victoria Lopez Apodaca, who lives in Las Cruces, NM and

has a different social security number." *See*, Exhibit 17, letters. Nevertheless, following the

April 2004 investigation, Equifax continued to report the derogatory Discover account.

Equifax has failed to produce in discovery the April 2004 CDV directed to Discover.

This CDV likely contains information that harms Equifax's claim that its CDV system – as

applied in this case – is reasonable. The absence of the CDV entitles Ms. Apodaca to an

instruction allowing her to seek punitive damages.

### 3.   Equifax Shredded Phone Logs

Beverly LeBlanc, an outsource agent for Equifax who handled some of Ms. Apodaca's

telephone disputes, admitted that she shredded telephone logs concerning these disputes. *See,*

Exhibit 33. Ms. LeBlanc deposition, 20:19-25. These phone logs were important evidence. They

likely corroborated Ms. Apodaca's testimony about repeatedly faxing the Bankruptcy Court

documents to Equifax, that Equifax claimed it had not received. *See*, Exhibit 15, Ms. Apodaca

deposition, 37:22-25, 38:1-6.

## I.   Equifax's Dispute System Lacks Key Mechanisms to Handle Mixed File Disputes Adequately

Punitive damages "may be warranted where the evidence shows that inaccuracies in

credit reports arise from something more than an isolated instance of human error which the

agency promptly cures." *Evantash*, 2003 U.S. Dist. LEXIS 23131 at *26 (quotations omitted);

*Sheffer v. Experian Information Solutions. Inc.*, No. 02-7407, 2003 U.S. Dist. LEXIS 12728 at

*12-13; *Boris v. Choicepoint Services*, 249 F.Supp.2d 851, 862 (W.D. Ky. 2003); *Graham*, 306

F.Supp.2d at 881 (plaintiff raised an issue of material fact regarding whether he was entitled to

punitive damages where the credit reporting agency's system did not retain the source of the

consumer address information it had in its file); *McKeown v. Sears Roebuck & Company*, 335

F.Supp.2d 917, 941 (W.D. Wis. 2004) (same). Equifax's system contained many faulty

mechanisms. The jury could reasonably conclude that these systemic inadequacies in Equifax's

dispute system – motivated by cost-cutting – show a conscious disregard of Ms. Apodaca's and

other consumers' rights under the FCRA and thus award punitive damages.

### 1.   Partial Matching Logic Does Not Work

There are three national credit reporting agencies, but only Equifax mixed Ms. Apodaca's

credit files with the file of Vicky Lopez Apodaca. Neither Trans Union nor Experian reported Vicky Lopez Apodaca's derogatory accounts as belonging to Ms. Apodaca. *See*, Exhibit 26, Mr. Hendricks supplemental report, p. 3. Only Equifax, using partial matching logic, mixed the files.

Equifax continued to use partial matching logic even after it receives notice from the consumer that this system mixes that consumer's file with the file of another. *See, infra*, III(C).

### 2.   Equifax Does Not Have the Ability to Suppress Key Data

Equifax's system, at the time of Ms. Apodaca's disputes, did not have the ability to "suppress" social security numbers or dates of birth. "Suppression" means that any credit data that is connected to the suppressed data will be kept off the credit report. For example, each of Vicky Lopez Apodaca's delinquent accounts was linked to Vicky Lopez Apodaca's social security number. The merchant reports the bad account under her name and social security number. If Equifax "suppressed" the incorrect social security number, like Ms. Apodaca told them in every letter, those derogatory accounts could not have reappeared on Ms. Apodaca's credit report. *See*, Exhibit A, Ms. Fluellen deposition, 191:17-25, 192:1-4, 193:25, 194:1-4; Exhibit 26, Mr. Hendricks supplemental report, p. 8-9.

Equifax has no explanation as to why it did not have these suppression mechanisms in place at the time of Ms. Apodaca's disputes. *See*, Exhibit A, Ms. Fluellen deposition, 194:5-8.

### 3.   Equifax Could Not Cross Check for Obvious Inconsistencies

Equifax's system lacked any way to cross-check accounts against each other for clear inconsistencies. After Equifax removed the bankruptcy from Ms. Apodaca's credit report, it nonetheless continued to report the Discover account as "included in bankruptcy." *See, id.* at 231:9-17.

### 4.   Equifax Deliberately Eliminated Document Review

Furthermore, when Equifax trimmed its costs, slashed its payroll and started hiring foreign agents after 1999, it cut back its investigation process severely in another way. It used to be that an Equifax investigator could look at the documents that a consumer sent. For example, agents who reviewed a dispute could have in hand the documentary proof which supported the consumer's dispute. Ms. Apodaca repeatedly sent Equifax many documents:

- the Bankruptcy Court Form 20 and docket sheet;
- detailed letters of explanation;
- copies of her social security card;
- copies of her driver's license'
- a copy of her credit report highlighting the mixed accounts;
- a letter from Citizens Bank explaining how these were two different women.

However, under its "new" system, these agents in foreign countries could not get their hands on the documents already sent. Equifax had no scanning (imaging) process to make the documents available on the computer screen. The agent in Jamaica could not see the documents sent to Atlanta. An agent in Atlanta could not see the documents sent to Canada. Equifax might have saved a lot of money by eliminating the ability of agents to review documents, but it severely its ability to conduct a genuine investigation of disputes.

Ms. Fluellen admitted that before Equifax outsourced, all the work was in the same building in Atlanta. Its agents were 20 feet away from the documents sent to Equifax. Fluellen deposition, Exhibit A, 49:16-25. Although Equifax hired foreign agents in early 2000 (Id., 50:9-14), it did not give them access to scanned documents until August, 2004. Id. at 43:24 - 44:6. Ms. Apodaca's dispute began in June, 2003.

**J.    Equifax Did Not Follow Its Own Policies in Investigating Ms. Apodaca's Disputes**

A defendant's course of conduct, considered cumulatively, can justify the award of punitive damages under the FCRA. The jury reasonably could conclude that the frequency of

"mistakes" that took place in the course of Ms. Apodaca's disputes show a conscious disregard

of Ms. Apodaca's rights and merits the award of punitive damages.

> For a violation to be "willful" within the meaning of the FCRA thereby justifying
> an award of punitive damages, the plaintiff need only demonstrate that the
> **defendants' course of conduct** was tantamount to a "conscious disregard" for the
> plaintiff's rights **or** that the defendants' course of conduct entailed "deliberate and
> purposeful" actions taken against the plaintiff's rights.

*White v. Imperial Adjustment Corporation,* No. 99-3804, 2002 U.S. Dist. LEXIS 26610 at *38

(E.D. La. 2002) (emphasis in original).

Here, the tangle of Equifax's 20 agents working on this investigation made a massive

number of "mistakes." Equifax failed to designate it as a mixed files case. Fluellen deposition,

Exhibit A, 140:14-22. It threw away the highlighted consumer report showing the accounts Ms.

Apodaca disputed. *Id.* at 150:14-151:12. It did not change the name on the credit report to

Victoria Apodaca from Victoria Lopez Apodaca. *Id.* 157:3-7. In response to one of Ms.

Apodaca's disputes, Equifax made the problem worse by "updating" Ms. Apodaca's file to add

the date of birth for Vicky Lopez Apodaca. *Id.* at 176:1-9. It failed to suppress the Las Cruces

address of Vicky Lopez Apodaca, which would have kept this known incorrect address from

reappearing on Ms. Apodaca's credit report. *Id.* at 191:14-16. It repeatedly failed to record in its

computerized dispute system that accounts belonging to Vicky Lopez Apodaca were being

wrongly attributed to Ms. Apodaca. *Id.* at 188:7-14. Two years later, Equifax still does not

know whether it had managed to separate the credit data of Ms. Apodaca from that of Vicky

Lopez Apodaca, and to create separate files for the each of them in October, 2003, four months

after Ms. Apodaca began her disputes. *Id.* at 222:7-23. (Equifax admits that, by October, 2003,

it should have at least created two separate files, *Id.* at 223:19-24). Ms. Fluellen's deposition

transcript contains a dozen other "possible" mistakes.

**IV.    Wells Fargo's Denial of Ms. Apodaca's Credit Card Application Is Relevant and Admissible**

    **A.    The Application for a Wells Fargo Credit Card Was Not an Application for a Business Credit Card, or the Fact is Disputed**

Equifax argues that the jury cannot consider the damages flowing from the denial of credit by Wells Fargo, based solely on the bankruptcy listed appearing on her Equifax credit report. *See*, Equifax's brief, pp. 14-15.

Ms. Apodaca disputes that she applied for the credit card for commercial credit purposes. The credit card application was in her name only. The application did not mention her husband's auto repair business. Although Ms. Apodaca did intend to use the card in part for expenses related to her husband's auto repair business, she sought a card that would be issued in her name only and she intended to also charge items for her personal use. Wells Fargo considered the application an application for a consumer credit. Wells Fargo denied the application for the sole reason that "consumer has bankruptcy on his/her credit bureau" from Equifax. *See*. *infra*, II(O); Exhibit 21, Ms'Apodaca affidavit.

Where a dispute of fact exists, summary judgment is inappropriate. *Matise v. Trans Union Coproration*. No. 3:96-CV-3353, 1998 U.S. Dist. LEXIS 19775 at *5-6 (N.D. Tex. Dec. 1, 1998) (citations omitted)(a reasonable trier of fact could find that the transactions involved a consumer report, not a commercial transaction).; *Natale v. TRW, Inc.*. No. 97-C-3661, 1999 U.S. Dist. LEXIS 3882 at *11-12 (N.D. Cal. 1999) (in FCRA case "it is premature for the Court to finally determine what if any damages plaintiff my recover" where plaintiff, who ran a sole proprietorship, had applied for a Small Business Association loan because recovery is forbidden only for "damages related ***primarily*** to his business") (emphasis added); *Boothe v. TRW Credit Data*, 523 F.Supp. 631, 634 (S.D. N.Y. 1981) (summary judgment denied under FCRA where

"there is a dispute as to the nature of the report").

**B.    Wells Fargo Denied the Credit Card Application Based on a Consumer Report Provided to It by Equifax**

"[T]he proper focus for determining whether a report falls under the [FCRA's] definition of consumer report is the purpose for which it was collected, and not solely the purpose for which it was released." *Boothe*, 523 F.Supp. at 634. Here, Equifax collected the information included on Ms. Apodaca's consumer report by receiving updates from her creditors. Equifax does not challenge that the accounts it listed on Ms. Apodaca's consumer report were consumer accounts nor does it challenge that the accounts it reported under Ms. Apodaca's name were collected by it for the purpose of providing consumer reports. Equifax stipulated in this case that it acted as a "consumer reporting agency" and that Ms. Apodaca is a "consumer." *See*, Docket No. 21, p. 2, Stipulations Nos. 2 and 4.

**C.    Damages Other than "Business Damages" Flow from the Denial of the Wells Fargo Credit Card**

Ms. Apodaca is entitled to actual damages. The remedy sections – 15 U.S.C. §§ 1681n and 1681o – do not contain any limitation on those actual damages. The damages are not limited to "business damages" and they are not limited to damages that flow from a "consumer report."

Ms. Apodaca's actual damages include lost time, aggravation, inconvenience, embarrassment and frustration. These damages are allowed under the FCRA. *See*, *Thompson v. San Antonio Retail Merchants Association*, 682 F.2d 509, 513 (5th Cir. 1982); *Bryant*, 487 F.Supp. at 1240; *Collins v. Retail Credit Company*, 410 F.Supp. 924, 932 (E.D.Mich. 1976); *Millstone v. O'Hanlon Reports, Inc.*, 383 F.Supp. 269, 276 (E.D.Mo. 1974).

Ms. Apodaca applied for the Wells Fargo credit card in November, 2003  *six months after* she had started disputing with Equifax. She applied at the same time as her 17 year old

daughter applied for the same card. *See*, Exhibit 15, Apodaca deposition, 43:12-23. Her

daughter was approved for the card but Wells Fargo denied Ms. Apodaca based on the

bankruptcy listed by Equifax. *Id.* at 44:25, 45:1-13. Her experience with the denial by Wells

Fargo contributes to her embarrassment damages. *Id.* at 52:3-25, 53:1-9.

Ms. Apodaca does not claim any "business damages" from the denial of her Wells Fargo

credit card application. If Equifax is concerned that the jury could wrongfully impute "business

damages" to Ms. Apodaca based on the Wells Fargo denial, it can seek a limiting instruction.

## V.     Ms. Apodaca Will Not Present Evidence About the Unpainted Furniture Denial

Ms. Apodaca will not present testimony about credit denial by Unpainted Furniture at

trial. Ms. Apodaca's counsel told Equifax's counsel that Ms. Apodaca would not present

testimony on this denial, but Equifax asked for summary judgment on this point anyway.

Summary judgment on this issue is moot because of the parties' agreement.

## VI.    Ms. Apodaca's New Mexico Credit Bureau Act Claim Is Not Preempted

Equifax argues that Ms. Apodaca's claims under the New Mexico Credit Bureaus Act,

NMSA 1978 § 56-3-1 *et seq.* ("CBA"), are preempted because the FCRA preempts state

common law claims unless the plaintiff proves "malice or willful intent to injure." *See*,

Equifax's brief, pp 16-17; *Young v. Equifax Credit Information Services Inc.*, 294 F.3d 631, 638

(5th Cir. 2002) ("The FCRA preempts state law defamation or negligent reporting claims unless

the plaintiff consumer proves 'malice or willful intent to injure' him") (emphasis added).

Equifax ignores the obvious: Ms. Apodaca's CBA claims are not state common law

claims. The FCRA provision on which Equifax relies makes clear that only state common law

claims are preempted, and then only if the plaintiff fails to prove "malice or willful intent."

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding *in the nature of defamation, invasion of privacy, or negligence* with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h or 1681m of this title, or based on information disclosed by a user of a consumer credit report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e) (emphasis added).

Ms. Apodaca's CBA claims are statutory. The claims overlap her FCRA claims. The CBA is New Mexico's analogue to the federal FCRA. *See*, NMSA 1978 § 56-3-1 *et seq.* At this stage there are no issues regarding duplication of recovery or election of remedies; these issues would be decided after trial.

> The doctrine does not require the plaintiff to abandon one of its theories before trial. To hold otherwise would require unfairly the plaintiff to bear the risk of predicting the outcome of his or her case.

*Elliot v. Aspen Brokers, Ltd.*, 825 F.Supp. 268, 269 (D. Colo. 1993).

## VII.   Conclusion

Ms. Apodaca requests that the Court deny Equifax's motion for partial summary judgment.

Respectfully submitted,

FEFERMAN & WARREN, Attorneys for Plaintiff

Richard N. Feferman
Robert Treinen
300 Central, S.W., Suite 2000 East
Albuquerque, New Mexico 87102
(505) 243-7773

**THE EXHIBITS ATTACHED TO THIS PLEADING ARE TOO VOLUMINOUS TO SCAN.  SAID EXHIBITS ARE ATTACHED TO THE ORIGINAL PLEADING IN THE CASE FILE WHICH IS LOCATED IN THE RECORDS DEPARTMENT, U.S. DISTRICT COURT CLERK'S OFFICE...**