# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**VICTORIA APODACA**,

      Plaintiff,

   vs.                              No. CIV 04-0717 MCA/WDS

**DISCOVER FINANCIAL SERVICES**, and
**EQUIFAX INFORMATION SERVICES LLC.**,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on *Defendant Equifax's Motion for Partial Summary Judgment* [Doc. 173] filed on December 7, 2005.  Having considered the parties' submissions, the relevant law, and being fully advised in the premises, the Court finds that there are genuine issues of material fact which preclude summary judgment as to the issues of willfulness, punitive damages, denial of a Wells Fargo credit card, and Plaintiff's state-law claim under the New Mexico Credit Bureaus Act.  The Court further finds that Defendant's motion is moot as to the denial of interest-free financing at the "Unpainted Furniture" store, because Plaintiff has withdrawn that aspect of her claims.  Accordingly, Defendant's motion for partial summary judgment is denied.

## I.   <u>BACKGROUND</u>

On June 25, 2004, Plaintiff Victoria Apodaca filed this civil action against Defendants Discover Financial Services (Discover) and Equifax Information Services LLC (Equifax) alleging violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681i and 1681e, and the New Mexico Credit Bureaus Act, N.M. Stat. Ann. §§ 56-3-1 to 56-3-8 (Michie 2004). [Doc. 1.] Plaintiff subsequently reached a settlement with Discover [Doc. 100], and Equifax filed a motion for partial summary judgment on December 7, 2005. [Doc. 173.] Viewed in the light most favorable to Plaintiff, the undisputed facts and evidence of record relevant to Equifax's motion can be summarized as follows.

Plaintiff's *Complaint* arises from a dispute over the accuracy or applicability of information appearing on credit reports generated by Equifax. This dispute began when Plaintiff sent a letter to Equifax dated June 26, 2003, stating that information regarding a different person with a similar name and social security number appeared on her credit report. Plaintiff's letter identified the other person's name as "Victoria Lopez Apodaca" with a social security number ending in "2649." [Ex. 14 to Doc. 183; Doc. 175.] This information was detrimental to Plaintiff because the other person appearing on her credit report had filed for bankruptcy and had several accounts (including a Discover credit card) that were reported as past due or discharged in bankruptcy. [Ex. 2 to Doc. 183.]

Equifax did not resolve the dispute to Plaintiff's satisfaction. Consequently, Plaintiff made several other inquiries and requests to Equifax. On August 12, 2003, Plaintiff sent a written request to Equifax personnel via facsimile stating as follows:

I am Faxing the petition and bankruptcy record of Victoria Lopez Apodaca [Social Security Number redacted]. Hopefully this will take care of my credit report that I am not this Victoria Lopez Apodaca. I am Victoria Apodaca [Social Security Number redacted.] Please remove this from my credit file ASAP. As I have stated in my last 3 letters to Equifax this other person is making it difficult for me to purchase a home, that were suppose to be moving into Friday  Aug. 15th.

Sonya, I have been trying to clear up my credit file with Equifax since May. I have send in letters, verifications (drivers license, pay stubs, social security number etc.) and this matter still isn't cleared up. I am hoping you can take care of this matter ASAP. Please give me a call at [telephone number redacted] when you have received this fax and have cleared it from my file. The underwriter for the home is just waiting to have this cleared, so we can sign the paperwork and close the purchase of our home by this Friday. Thank you Sonya!

[Ex.6 to Doc. 183.]  Plaintiff sent copies of the bankruptcy records referenced above to

Equifax personnel on other occasions, including two faxes addressed to "Bev. Supervisor"

respectively dated August 14, 2003, and August 18, 2003 [Ex. 7, 16 to Doc. 183], and two

letters respectively dated October 9, 2003, and April 2, 2004 [Ex. 17 to Doc. 183].

Plaintiff's letter of October 9, 2003, stated as follows:

I have been contacting you repeatedly since June to get my credit report corrected. You are reporting incorrect information that belongs to Victoria Lopez Apodaca.

My birth date is [redacted]. My Social Security number is [redacted]. Above is my current address. I am enclosing a copy of my Social Security Card and my driver's license, which shows my birth date. You are incorrectly reporting my birth date as 7/20/51. I have previously provided you with both my driver's license and my Social Security card, but you are still reporting my birth date incorrectly.

In addition, you are incorrectly reporting that I filed for bankruptcy in New Mexico. I have never filed for bankruptcy. I am enclosing proof from the bankruptcy court that this bankruptcy is not mine. I have previously

provided you with this proof that the bankruptcy is not mine, but you are still reporting it on my credit report.

Finally, you are also reporting the following items which are not mine:

-Direct Merchants, account number [redacted]
-Discover Financial, account number [redacted]
-GMAC, account number [redacted]

I have previously disputed these items with you over the telephone, but you continue to report them as mine.

Please correct my birth date, remove the bankruptcy and the above items from my credit report.  Thank you.

[Ex. 17 to Doc. 183.]  Plaintiff's letter of April 2, 2004, stated as follows:

Equifax is reporting items on my credit report that are not mine.  These accounts belong to Victoria Lopez Apodaca, who lives in Las Cruces, NM and has a different social security number.  Victoria Lopez Apodaca's social security number is [redacted].

Equifax is incorrectly reporting that I filed for bankruptcy in New Mexico.  I have never filed for bankruptcy.  Please find the enclosed proof from the bankruptcy court that the bankruptcy is not mine.  I have previously provided you this proof, but you are still reporting the bankruptcy on my credit report.

Equifax is also reporting the following accounts, which are not mine: Discover Financial Account No. [redacted] and GMAC account no. [redacted]. I previously disputed these items, but Equifax continues to report them as mine.

Please delete the bankruptcy and the Discover Financial and GMAC accounts from my credit report.  Please provide me with the results of your investigation.

[Ex. 17 to Doc. 183.]

Equifax did not delete the bankruptcy or the GMAC account from Plaintiff's credit report until after receiving Plaintiff's letter in April 2004. [Doc. 175.] The information regarding the Discover credit card remained on Plaintiff's credit report after that date, and other negative information attributable to another person remained on Plaintiff's credit report as of September 1, 2004, several months after she filed this civil action. [Ex. 28 to Doc. 183.]

As a result of the errors in Equifax's credit report and Equifax's failure to promptly correct those errors, Plaintiff claims that she and her family lost favorable financing for the purchase of a home referenced in her request of August 12, 2003 [Ex. 6 to Doc. 183], and that Wells Fargo Bank denied her application for a credit card in the Fall of 2003 [Ex. 19, 21 to Doc. 183.] Plaintiff seeks compensatory damages for the injuries she sustained as a result of these lost opportunities to engage in consumer credit transactions, as well as the damage to her credit rating, lost time, aggravation, inconvenience, embarrassment, and frustration resulting from Equifax's conduct. She also seeks punitive damages. [Doc. 1.]

In response to Plaintiff's claims, Equifax does not deny that Plaintiff's credit information became mixed with the credit information of another person who goes by the name "Victoria Lopez Apodaca," and that this mixture resulted in numerous inaccuracies on Plaintiff's credit report. During the course of this litigation, the parties located and deposed the person with whom Plaintiff's credit information was mixed [Ex. 2 to Doc. 183], so there is no question that there exist two separate people with similar names and Social Security numbers, one of them being the Plaintiff in this case.

Equifax offers the following explanation of why it took the company so long to recognize this fact and correct Plaintiff's credit report. Credit information regarding Plaintiff and millions of other consumers is stored in computer files in an automated data bank that Equifax creates and maintains for use in its business as a credit reporting agency. [Doc. 175.] The files in this data bank are "built" using a search logic that is designed to organize credit information in a single file pertaining to one consumer if the information matches at least seven of the nine digits of that consumer's Social Security number, and has the same name and same state of residence. Equifax uses such "partial matching logic," instead of requiring a total match of all identifying information concerning a particular consumer, in order to account for imperfections in the data it receives (such as minor name variations, the transposition of two digits of a Social Security number, or similar typographical errors). [Ex. B to Doc. 174.]

In this case, Equifax's partial matching logic mistakenly identified Plaintiff and "Victoria Lopez Apodaca" as one and the same consumer because seven of the nine digits in their Social Security numbers matched, they both resided in the State of New Mexico, and they use the same first and last name. Thus, from the outset Equifax placed the credit information regarding the two consumers in the same "mixed file," such that credit information about one consumer would appear on the credit report for the other, and vice versa. [Ex. B to Doc. 174; Doc. 175.]

Equifax has identified two possible ways in which a "mixed file" situation such as this one might be corrected. First, one of the companies that furnishes information to Equifax

(such as a creditor or public-records vendor) might update the information it has previously supplied to Equifax, either manually on a "Universal Data Form" or by computer using an automated system.  Second, the consumer on whose credit report the information appears may dispute that information in a manner that causes Equifax to "reinvestigate" its accuracy or applicability.  [Doc. 175.]

In the event of a consumer dispute, Equifax's "reinvestigation" generally may take two forms.  First, Equifax claims to have a policy under which the disputed information will be deleted from an individual's file if that individual provides the company with "acceptable documents" which prove the inaccuracy or inapplicability of that information.  Equifax does not further explain exactly what it considers to be "acceptable documents" or how this policy applied in Plaintiff's dispute.[1]  [Doc. 175.]  The record reflects that Equifax did not consider any of the documents supplied by Plaintiff to be "acceptable" for this purpose, either because they were regarded as illegible or due to a lack of familiarity with bankruptcy court records and how they are authenticated.  [Doc. 175.]

The second form of "reinvestigation" employed by Equifax relies on the source of the disputed information rather than the individual who is disputing it.  This approach is known in the industry as "Consumer Dispute Verification" or "CDV."   [Doc. 175.]  Under this approach, Equifax employs a variety of agents or contractors whose first task is to summarize

---

[1]One witness testified that the policy regarding what is considered an "acceptable document" is spelled out in the "bankruptcy cleanup" section of a company manual.  [Ex. 8 to Doc. 183, at 67-68.]  Counsel for Equifax has represented, however, that no such section exists.  [Doc. 87, 88, 156.]

the nature of Plaintiff's dispute according to a system of three-digit codes.  Equifax's agent

or contractor then prints this coded summary on a standardized form and transmits the form

to the "furnisher," or source of the disputed information.  In Plaintiff's case, Equifax's CDV

form listed a disputed account and informed the furnisher that:  "Consumer States:  belongs

to another individual w/same name."   The furnisher then checked a preprinted box on the

CDV form to indicate:  "Verified as Reported," and returned the form to Equifax's agent or

contractor along with the consumer's identifying information.  [Ex. 23 to Doc. 183.]  At that

point, Equifax's agent or contractor checked to see whether at least two pieces of identifying

information supplied by the furnisher "matched" the information in Equifax's file.  [Ex. 30

to  Doc.  183.]   If  the  agent  or  contractor  found  such  a  match,  then  Equifax  ended  its

"reinvestigation" of the account, and the results were conveyed in summary form back to the

consumer.

       With regard to the dispute concerning the bankruptcy appearing on Plaintiff's credit

report, Equifax did not rely on the bankruptcy documents supplied by Plaintiff, nor did the

company  make  its  own  inquiry  with  the  bankruptcy  court.   Instead,  Equifax's  agent  or

contractor  contacted  the  company's  public-records  vendor,  Choicepoint,  and  provided

Choicepoint with the standard "response code" summarizing the general nature of Plaintiff's

dispute (such as 122 "Not his or hers, please provide complete ID," or 134 "belongs to

another individual"). Equifax did not actually send Choicepoint the bankruptcy documents

that Plaintiff had previously supplied to Equifax.  Choicepoint's role was simply to review

the information contained in the bankruptcy court records and parrot that information back

to Equifax.  [Ex. 4 to Doc. 183.]  The result of this process was that Choicepoint apparently failed to notice the transposed digits in the Social Security numbers for the two individuals, as well as other differences that could have been brought to Choicepoint's attention if Choicepoint had access to the documents supplied by Plaintiff, which specifically called attention to the transposed digits and other differences.

Eventually, Equifax admitted its mistakes and made some corrections to Plaintiff's credit report in late April 2004.  Some inaccuracies reappeared on Plaintiff's credit report, however, because the company's automated data-gathering system apparently did not have the capacity to override or suppress certain features of its "partial matching logic" in order to distinguish her from the other consumer who had similar identifying information, or to make the connection between the other consumer's bankruptcy and the accounts included in that bankruptcy.  [Ex. 1 to Doc. 183.]

## II.   ANALYSIS

### A.   Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact, and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if it might affect the outcome of the case.  See id. at 248.

When the movant is also the party bearing the burden of persuasion on the claim for which he or she is seeking summary judgment, the movant must show that the record as a whole satisfies each essential element of his or her case and negates any affirmative defenses in such a way that no rational trier of fact could find for the non-moving party.  See 19 Solid Waste Dep't Mechanics v. City of Albuquerque, 156 F.3d 1068, 1071 (10th Cir.  1998); Newell v. Oxford Mgmt., Inc., 912 F.2d 793, 795 (5th Cir. 1990); United Missouri Bank of Kansas City, N.A. v. Gagel, 815 F. Supp. 387, 391 (D. Kan. 1993).  But when the movant does not bear the burden of proof as to the claim or defense at issue in the motion, then judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex, 477 U.S. at 324. "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'"  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision,

Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions). In addition, the Court may disregard an affidavit that contradicts the affiant's own sworn deposition testimony if the Court finds that such an affidavit constitutes an attempt to create a "sham fact issue." Burns v. Bd. of County Comm'rs., 330 F.3d 1275, 1282 (10th Cir. 2003); Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1223 n.2 (10th Cir. 2000); Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986).

Apart from such limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

In this case, Equifax has submitted additional evidence with its reply brief. [Ex. A through G to Doc. 25.] The general rule is that when a movant submits additional evidence in support of summary judgment after the filing of the non-movant's response, district courts have the option of either disregarding that additional evidence or providing the non-movant with the opportunity to file a surreply. See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-65 (10th Cir. 1998). In this instance, I elect to disregard the additional evidence submitted for the first time with Equifax's reply brief because Plaintiff was not afforded a fair and timely opportunity to respond to this additional evidence.

### B.      Plaintiff's FCRA Claims

Plaintiff contends that Equifax violated at least two substantive provisions of the FCRA:  15 U.S.C. § 1681i, which sets forth Equifax's duties to investigate consumer disputes, and 15 U.S.C. § 1681e(b), which requires Equifax to follow reasonable procedures to assure the "maximum possible accuracy" of the consumer credit information it reports. The presence of an inaccuracy on a consumer's credit report will often create a question for the jury as to whether a defendant violated these provisions, especially when the consumer specifically notified the defendant of the inaccuracy and the defendant failed to prompty correct it.  See Lee v. Experian Information Solutions, No. 02 C 8424, 2003 WL 22287351, at *4 (N.D. Ill. 2003).  Merely showing that a credit report contains such an inaccuracy, however, does not shift the burden to the defendant to prove that its investigation and reporting procedures were reasonable.  See id.

For purposes of Equifax's summary-judgment motion, the parties do not dispute the general proposition that Plaintiff may obtain compensatory damages for the alleged violations of the FCRA if she proves that she sustained injuries as a result of Equifax's negligence or unreasonable procedures.  Rather, the focus of Equifax's motion is on the *extent* of Plaintiff's compensatory damages in this case, and whether she is entitled to any *punitive* damages on her FCRA claims.  I first examine the evidence concerning the extent of Plaintiff's compensatory damages and then turn to the issue of punitive damages.

1.    **Compensatory Damages**

Equifax seeks partial summary judgment on two aspects of Plaintiff's claim for compensatory damages:  (1) her unsuccessful effort to obtain credit for a purchase from the "Unpainted Furniture" store in August 2003; and (2) the denial of her application for a credit card from Wells Fargo Bank in the Fall of 2003.  Plaintiff has agreed not to present any evidence about the incident at the "Unpainted Furniture" store. [Doc. 183, at 39.]  Without such evidence, the jury will have no occasion to award any damages for injuries resulting from this incident.  Therefore, Equifax's motion is moot as to this issue.[2]

With respect to the Wells Fargo credit-card application, Equifax's argument rests on the premise that this credit card was going to be used primarily in Plaintiff's husband's automotive repair business, because Plaintiff indicated in her deposition testimony that she and her husband received tax advice suggesting it would be a good idea to segregate business and personal expenses by means of a separate credit card.  [Ex.15 to Doc. 183, at 43-44.] If that premise were true, then the relevant provisions of the FCRA would not apply because those provisions are limited to *consumer* credit reports, not *business* credit reports.  See 15 U.S.C. § 1681a(d).

Plaintiff disputes Equifax's claim that the Wells Fargo credit-card application fell outside the purview of the FCRA.  In addition to her own affidavit which clarifies the

---

[2]To the extent that Equifax has any concerns about whether Plaintiff will abide by this agreement at trial, that concern is better addressed in the pretrial order or by means of a motion in limine.

ambiguity in her deposition testimony on this point [Ex. 21 to Doc. 183], Plaintiff has presented the deposition testimony of a Wells Fargo banker who processed her credit-card application.  The banker's deposition testimony indicates that (1) Plaintiff applied for the card in her own name, (2) neither Plaintiff's husband nor his business were listed as co-applicants, and (3) the application was denied because Equifax erroneously reported a bankruptcy on Plaintiff's *consumer* credit report.  [Ex. 19 to Doc. 183.]  Viewed in the light most favorable to Plaintiff, this evidence supports a reasonable inference that she applied for the Wells Fargo credit card in her capacity as a consumer rather than as an agent for her or her husband's business.  Therefore, Equifax is not entitled to summary judgment on this issue.[3]

## 2.  <u>Punitive Damages</u>

A credit-reporting agency that "willfully fails to comply with any requirement" of the FCRA may be held liable for punitive damages.  15 U.S.C. § 1681n(a)(2).  The parties appear to agree that, in the context of civil liability, the FCRA's use of the word "willfully" does not necessarily connote an evil motive or actual malice.  They disagree, however, as to whether the term "willfully" extends to acts or omissions that are knowingly and intentionally committed in *reckless disregard* of consumer rights, or whether this term is limited to acts or omissions that are intentionally committed with *actual knowledge* that they

---

[3]As noted in Plaintiff's response brief [Doc. 183, at 39], Equifax may request a limiting instruction if it is concerned that a jury might mistakenly award damages for injury to Plaintiff's business or that of her husband.

violate the law.   [Doc. 183, at 3.]   Plaintiff advocates the "reckless disregard" standard articulated by the Third Circuit in <u>Cushman v. Trans Union Corp.</u>, 115 F.3d 220, 227 (3d Cir. 1997), and recently adopted by the Ninth Circuit in <u>Reynolds v. Hartford Financial Servs. Group, Inc.</u>, 435 F.3d 1081, 1098-99 (9th Cir. 2006).   Equifax advocates the "actual knowledge" standard articulated by the Eighth Circuit in <u>Phillips v. Grendahl</u>, 312 F.3d 357, 368-70 (8th Cir.2002).

I agree with Plaintiff that the authorities cited in favor of the "reckless disregard" standard provide a more cogent and balanced approach to the definition of "willfulness" in this context.   Under this approach, the term "'willfully' entails a 'conscious disregard' of the law, which means "'either knowing that  policy [or action] to be in contravention of the rights possessed by consumers pursuant to the FCRA or in reckless disregard of whether the policy [or action] contravened those rights.'"   <u>Reynolds</u>, 435 F.3d at 1098 (quoting <u>Cushman</u>, 115 F.3d at 227).   Allowing FCRA plaintiffs to prove willfulness  by showing a defendant's "reckless disregard" of the law's requirements is more appropriate in this context because it accords with Supreme Court precedent distinguishing civil liability from criminal liability, and because it best furthers the purposes and objectives of the FCRA.   <u>See</u> <u>id.</u> at *13-14.

In contrast, requiring FCRA plaintiffs to prove the defendant actually knew that it was violating the law would "create perverse incentives" for credit reporting agencies to pursue a policy of deliberate ignorance of the law in order to avoid liability for punitive damages. <u>Id.</u> at *14.   Under such a policy, a credit-reporting agency could make the economic

calculation that it is less expensive to simply ignore the law, stonewall consumers, and then pay compensatory damages for negligent violations that give rise to litigation, rather than open its eyes and pay the cost of genuinely responding to consumer complaints by conducting a more diligent investigation of disputed credit information in advance of litigation. I believe Congress intended the FCRA's punitive-damages provision to increase the economic risk entailed by such a policy and thereby dissuade credit-reporting agencies from pursuing it. For these reasons, I reject the "actual knowledge" requirement that Equifax advocates.

For the reasons articulated below, however, I also conclude that even under an "actual knowledge" standard, there are genuine issues of material fact which preclude summary judgment as to whether Equifax acted willfully in this case. Under the Eighth Circuit's articulation of this standard, evidence that Equifax's agents or contractors acted recklessly may still be relevant to show that the company engaged in "a willful failure to institute procedures to avoid recklessness on the part of its employees." Phillips, 312 F.3d at 369. Circumstantial evidence of the company's "experience in dealing with credit reports" and knowledge of the FCRA also "can support an inference that the defendants knew that their actions were impermissible." id. at 369-71; see Graham v. CSC Credit Servs., Inc., 306 F. Supp. 2d 873, 880-81 (D. Minn. 2004). Applying this standard to the facts presented in Phillips, 312 F.3d at 371, the Eighth Circuit concluded that there were genuine issues of material fact which precluded summary judgment on the issue of willfulness.

I reach a similar conclusion here.  Equifax's arguments in support of its motion for partial summary judgment on this issue cite various authorities which have approved or condoned a credit-reporting agency's use of partial matching logic and the CDV procedure in certain circumstances.  In light of these authorities, Equifax asserts that it could not have willfully violated the FCRA in this case because it did not know, and had no reason to know, that its partial matching logic and/or CDV procedure violated the FCRA.

I reject this argument because it employs the fallacy of diversion, also known as the "straw man" fallacy.  See Edward Damer, Attacking Faulty Reasoning 157 (3d ed. 1995). Under this fallacy, Equifax avoids disputed factual issues by minimizing or distorting Plaintiff's claim for punitive damages so that it is limited to a facial attack on the legality of the company's "partial matching logic" and the CDV procedure.  Having minimized or distorted Plaintiff's claim in this manner, Equifax then proceeds to refute it by showing that the use of partial matching logic and the CDV procedure is not illegal *per se* in every case.

I agree with Equifax that if Plaintiff were relying solely on a general policy argument in favor of scrapping partial matching logic and the CDV process altogether, then such an argument would not suffice to prove willfulness in this case because there is nothing illegal *per se* about using partial matching logic and the CDV process as *part* of Equifax's credit-reporting business.  We do not live in a perfect world, and therefore any credit-reporting agency must choose between a system that defaults to a procedure that is under-inclusive or a system that defaults to a procedure that is over-inclusive.

An under-inclusive procedure is one that operates under the presumption that credit information does not apply to a particular consumer unless it matches exactly with all identifying information for that consumer and is not disputed by that consumer. As Equifax points out, such a procedure is insufficient because there are instances where credit information that genuinely applies to a particular consumer will not provide an exact match due to the presence of name variations, transposed digits and other typographical errors, or outright fraud by the consumer. Failure to include such information operates to the detriment of creditors who need it in order to fairly determine whether and under what terms to extend credit to consumers.

An over-inclusive system is one that requires less than an exact match of identifying information and operates under the presumption that furnishers of credit information are more reliable than consumers. As Plaintiff points out, such a procedure also is insufficient because it will result in the type of inaccuracies present in this case, where consumers are burdened by negative information on their credit reports that does not belong there.

The real question Plaintiff is raising in this case, however, is not whether to operate a system that defaults to an over-inclusive procedure instead of an under-inclusive procedure, but what additional steps, if any, are required to override or correct the standard procedures to which a credit-reporting agency defaults when those procedures are not functioning

properly.[4]  In other words, I do not understand Plaintiff to be claiming punitive damages merely because Equifax's credit-reporting system initially defaulted to an over-inclusive procedure that mistakenly included information belonging to another consumer on her credit report and relied on the furnisher of that information to determine its accuracy or applicability.  Rather, I understand Plaintiff to be making the argument that punitive damages are warranted because Equifax consciously and recklessly decided not to make available any additional steps which would have overridden or supplemented the standard procedures to which it initially defaulted in Plaintiff's case, even though the company knew that those procedures were so over-inclusive they would result in violations of consumer rights without such additional steps.

In deciding similar claims, courts have reasoned that such "exclusive reliance" on furnishers of credit information and standardized procedures such as partial matching logic "may not be justified once the credit reporting agency receives notice that the consumer disputes information contained in his [or her] credit report."  Henson v. CSC Credit Servs, 29 F.3d 280, 286 (7th Cir. 1994); accord Cushman, 115 F.3d at 224-25; Johnson v. MBNA America Bank, NA, 357 F.3d 426, 432 (4th Cir. 2004).  "When a credit reporting agency receives such notice, it can target its resources in a more efficient manner and conduct a

---

[4]Such additional steps might be characterized as a "selective requirement limited to cases where suspicious circumstances plainly indicate a need for further inquiry," while the standard CDV procedure might be characterized as a "broadly imposed requirement" to which the system initially defaults.  Lee, No. 02 C 8424, 2003 WL 22287351, supra, at *6 n.9.  Unlike Mr. Lee's counsel, I do not understand Plaintiff's counsel in this case to be "push[ing] the envelope" in favor of a "broadly imposed requirement of greater independent investigation" in every single case.  Id.

more thorough investigation." Henson, 29 F.3d at 286-87.  In such situations, "[i]t would make little sense to conclude that, in creating a system intended to give consumers a means to dispute--and, ultimately, correct--inaccurate information on their credit reports, Congress used the term 'investigation' to include [only] superficial . . . inquiries by creditors" that "do not look beyond the [automated] information" in their own computer systems and "never consult underlying documents such as account applications" and the like.  Johnson, 357 F.3d at 430-31.

Similarly, there are circumstances in which the FCRA may require a credit-reporting agency to go beyond the initial CDV process and "verify the accuracy of its initial source of information." Henson, 29 F.3d at 287.  Courts determine the existence and extent of such a requirement by balancing "the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer," which in turn "will depend, in part, on whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable." Id.  "Once a claimed inaccuracy is pinpointed, a consumer reporting agency conducting further investigation incurs only the cost of reinvestigating that one piece of disputed information." Cushman, 115 F.3d at 225.  In such instances, "the likelihood that the cost-benefit analysis will shift in favor of the consumer increases markedly." Id.

Equifax points out that the cost-benefit analysis required to determine whether to go beyond the CDV procedure also may shift in favor of the credit-reporting agency rather than

the consumer in some cases.  For example, the use of the CDV procedure alone may suffice when the disputed information does not create the potential for harm to the consumer because it was never listed as a negative item on her credit report, and the consumer's complaint lacks the specificity required to pinpoint the nature of the claimed inaccuracy or explain why a particular source is unreliable.  See, e.g., Bagby v. Experian Information Solutions, Inc., No. 04-2593, 2006 WL 14580, at *1, 5-6 (7th Cir. Jan. 4, 2006) (unpublished order).  Similarly, an isolated instance of human error which the credit-reporting agency promptly corrects through the CDV procedure alone generally will not warrant an award of punitive damages.  See Evantash v. G.E. Capital Mortgage Servs., No. Civ.A. 02-CV-1188, 2003 WL 22844198, at *8 (E.D. Pa. Nov. 25, 2003).

But the evidence of record in this case, when viewed in the light most favorable to Plaintiff, contrasts sharply with the facts recited in Bagby and the other authorities cited by Equifax.  In Plaintiff's case, the disputed information reported by Equifax involved a bankruptcy and several accounts that were listed as past due and/or discharged in that bankruptcy.  Moreover, Plaintiff has presented evidence that Equifax did not promptly correct the multiple errors the company made in reporting this information.

It is reasonable to infer that the information Equifax erroneously reported would be regarded as very negative by potential creditors and others who had occasion to review this information on Plaintiff's credit reports, and that this erroneous negative information appeared on Plaintiff's credit reports for a significant period of time.  Accordingly, a rational factfinder could infer that the potential harm to Plaintiff caused by this inaccurately reported

information was very high and weighed strongly in favor of investing the resources necessary to complete a more thorough investigation that goes beyond the minimal CDV procedure on which Equifax relied.

A rational factfinder also could conclude, however, that Plaintiff significantly reduced the costs of such additional investigation because her communications with Equifax pinpointed the inaccuracies in her credit report, supplied supporting documents such as the bankruptcy court records, and called attention to specific differences between her identifying information and that of the other consumer appearing on her credit report (including the differences in their Social Security numbers). Thus, if Equifax had forwarded copies of all the information supplied by Plaintiff to a competent investigator or public-records vendor instead of simply reducing all of that information to a three-digit code on its standardized CDV form, it is reasonable to infer that the mixed-file situation could have been corrected more promptly without imposing significant additional costs on Equifax or requiring the company to make extensive, system-wide changes to its business. Indeed, the cost of correctly performing the investigation in this manner the first time might well be less than the cost of the "reinvestigation" procedure that Equifax actually employed in this case, which simply repeated the cursory CDV process over and over again with the same result.

Further, Plaintiff has presented evidence that Equifax was aware that its use of partial matching logic to build consumer credit files could result in "mixed file" situations like this one, and that its standardized CDV procedure alone would be inadequate to correct such situations. Plaintiff's evidence on this point appears to fall under three categories.

-22-

Under the first category, Plaintiff points to evidence obtained directly from Equifax's officers, employees, agents, or contractors. This evidence includes (1) the deposition testimony of Equifax officials explaining how the company's files can get mixed and acknowledging that the company has not changed its search logic for matching Social Security numbers since 1991 [Ex. 1, 27 to Doc. 183]; (2) discovery responses and deposition testimony of Equifax agents or contractors indicating that they were not specifically trained on mixed files and that Plaintiff's disputes were handled in a piecemeal fashion by different personnel who did not have access to all of the relevant information [Ex. 4, 24, 25, 30 to Doc. 183], and (3) discovery responses summarizing Equifax's litigation history involving mixed-file claims by other individuals [Ex. 25, 29 to Doc. 183].

Viewed in its totality, this first category of evidence supports a reasonable inference that Equifax knew its partial matching logic would result in mixed files in a significant number of cases and that its standard CDV procedure alone would be inadequate to correct such problems inasmuch as a significant percentage of the employees the company tasked to perform the CDV procedure in Plaintiff's case lacked adequate supervision, training, and resources. Combined with the evidence suggesting that Equifax failed to offer any appeal procedure or quality-control mechanism to correct such deficiencies in Plaintiff's case, but instead waited until after this litigation commenced to take Plaintiff's credit file "off line," a rational factfinder could conclude that Equifax willfully violated the FCRA.

Plaintiff also has presented a second category of evidence concerning Equifax's knowledge of the problem of mixed files, which consists of public records and regulatory

-23-

materials. These materials include: (1) an agreement dated June 22, 1992, between Equifax and the attorneys general of several states (including New Mexico) under which Equifax agreed to "[i]mplement, utilize and maintain reasonable procedures to prevent the occurrence or reoccurrence of Mixed Files, including but not limited to accepting and using a Consumer's Full Identifying Information for matching and identification purposes" [Ex. 10 to Doc. 183]; (2) an excerpt from a *Decision and Order* of the Federal Trade Commission (FTC) indicating a settlement agreement with Equifax [Ex. 11 to Doc. 183]; and (3) an FTC report dated December 2004 discussing the problem of mixed files [Ex. 12 to Doc. 183].

The mere existence of such materials, in and of themselves, does not prove that Equifax willfully violated the FCRA in this case; however, such materials may be relevant for the limited purpose of providing circumstantial evidence of Equifax's knowledge of the mixed-file problem resulting from its partial matching logic and its reliance on furnishers of credit information to resolve consumer disputes. Evidence that this problem was a matter of public record and regulatory concern for many years may serve this purpose by showing the problem was so obvious that Equifax could not have remained ignorant of it.[5]

The third category of evidence concerning Equifax's knowledge consists of the proposed testimony of Plaintiff's expert, Evan Hendricks. I do not consider this category of evidence at this juncture because, thus far, Plaintiff has only presented Mr. Hendricks' expert

---

[5]To the extent that Equifax is concerned about the potential for juror confusion or unfair prejudice arising from this category of evidence, such concerns are better addressed through a motion *in limine* or an objection to Plaintiff's trial exhibits; such concerns do not provide grounds for granting summary judgment at this juncture.

reports [Ex. 13, 26 to Doc. 183] in the form of unsworn statements consisting of hearsay and hearsay-within-hearsay.  Such reports "'do[ ] not meet the requirements of Fed. Rule Civ. Proc. 56(e)' and cannot be considered by a district court in ruling on a summary judgment motion." Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (quoting Adickes v. S.J. Kress & Co., 398 U.S. 144, 158 n.17 (1970)); accord Fowle v. C & C Cola, 868 F.2d 59, 67 (3d Cir. 1989); see Sofford v. Schindler Elevator Corp., 954 F. Supp. 1459, 1462-63 (D. Colo. 1997) (collecting cases); cf. Stuart v. Gen. Motors Corp., 217 F.3d 621, 635 n.20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed.R.Civ.P. 56(e).").

I also note that Equifax has filed a motion *in limine* [Doc. 176] to preclude Mr. Hendricks from testifying as an expert in this case on the grounds that he is not qualified and that his opinions do not meet the standards of reliability and relevance required under Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999), and Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  I defer ruling on Equifax's motion *in limine* but, in the interim, I do not consider Mr. Hendricks' opinions at all in ruling on Equifax's motion for partial summary judgment.

Nevertheless, the other categories of evidence presented by Plaintiff in response to Equifax's summary-judgment motion, when considered in their totality, are legally sufficient to create a genuine issue of material fact concerning the element of willfulness that is

-25-

necessary to support Plaintiff's claim for punitive damages under the FCRA.  Such evidence, when viewed in the light most favorable to Plaintiff, may support a reasonable inference "that the problems Plaintiff experienced were more than an isolated instance of human error," Evantash, No.Civ.A. 02-CV-1188, 2003 WL 22844198, supra, at *8, and resulted from an "intentional policy decision" to design and operate a system without adequate appeal procedures or quality-control mechanisms, see Graham, 306 F. Supp. 2d at 881.

Based on the evidence of record, a rational factfinder could conclude that Equifax knew that the pointless repetition of the cursory CDV procedure by its various agents and contractors was not going to resolve Plaintiff's dispute in a timely manner and only served to delay the matter until Plaintiff tired of the process or proceeded to litigation.  Equifax's continued reliance on such a procedure during the course of Plaintiff's disputes may reflect the calculation that simply allowing a certain category of FCRA violations to continue would be less costly to the company than fixing its internal dispute-resolution mechanisms to include an appeal procedure or quality-control function for use in special situations like this one, where the potential harm to the consumer is great and the information provided by the consumer is specific and detailed.  I believe Congress intended the FCRA's punitive-damages provision to deter such calculations by making it more costly for credit-reporting agencies to ignore a known category of FCRA violations in this manner.  Because there are disputed issues of material fact on this issue, I conclude that the question whether punitive damages are warranted in this case is for the jury to answer.

### C.      <u>Plaintiff's State Law Claims</u>

The FCRA makes credit-reporting agencies immune from suits "in the nature of defamation, invasion of privacy, or negligence" that arise from false information in a consumer credit report, unless the consumer can show that the "false information [was] furnished with malice or willful intent to injure such consumer."   15 U.S.C. § 1681h(e). Courts have concluded that this provision of the FCRA preempts certain "state *common law* defamation claims."   <u>Bloom v. I.C. System, Inc.</u>, 972 F.2d 1067, 1069 (9th Cir. 1992) (emphasis added).  In defining the scope of such preemption, "courts have determined that malice under this statutory scheme is congruent with the *common law* standard," which requires proof that the publisher of the information either knew it was false or acted with reckless disregard of whether it was true or false.   <u>Cousin v. Trans Union Corp.</u>, 246 F.3d 359, 375 (5th Cir. 2001) (emphasis added).   <u>But</u> <u>cf.</u> <u>Cushman</u>, 115 F.3d at 229 (distinguishing "malice or willful intent to injure" as it appears in the FCRA's preemption language from "willfulness" as it appears in the FCRA's language on punitive damages).

In this case, however, it is unnecessary to determine whether Plaintiff's state-law claims meet the common-law standard for malice because Plaintiff is not asserting any state-law claims "in the nature of defamation, invasion of privacy, or negligence" in this action. <u>Id.</u>  Rather, Plaintiff's *Complaint* asserts that Equifax violated Section 56-3-2 of New Mexico's Credit Bureaus Act (NMCBA), which provides that:

> A. Any credit bureau conducting business in the state shall provide trained personnel to interview and counsel with a consumer, during normal business

hours, concerning any information about that consumer contained in the credit bureau's files.

B. A credit bureau, upon request, shall disclose the content of all information about that particular consumer which is included in his credit report or rating, if the consumer making the request presents adequate identification.

C. For any consumer to whom credit has been refused because of a credit bureau's report, the credit bureau which compiled the report shall make any necessary reinvestigation and perform any necessary updating or correction of records at no cost to the consumer. A credit bureau may charge a fee of not to exceed five dollars ($5.00) for any reinvestigation requested by any consumer, if that consumer has not been refused credit on the basis of a credit bureau report.

D. After a credit bureau has been given written notice of any error in its credit report or record by a consumer, the credit bureau is liable for any subsequent report which fails to correct the error. However, prior to receiving written notice of such error, a credit bureau or its source of information is not liable for any damages caused by any reports or dispersal of information which is the result of an unintentional error of either the credit bureau or its source of information.

E. A credit bureau shall give to any consumer examining his credit record forms upon which to designate any errors which the consumer discovers in his credit record or report.

N.M. Stat. Ann. § 56-3-2. Section 56-3-7 of the NMCBA establishes civil liability for noncompliance with these provisions in a manner that parallels the FCRA. See N.M. Stat. Ann. § 56-3-7. Thus, the NMCBA operates as a state consumer-protection statute analogous to the FCRA, not merely a statutory codification of the common-law torts of defamation, invasion of privacy, or negligence.

Equifax does not present any authority to show that the preemption language in the FCRA was meant to apply to such statutory claims under the NMCBA, and I find no grounds

to support such a theory in this case.  In interpreting a preemption clause, courts "'must give effect to [its] plain language unless there is good reason to believe Congress intended the language to have some more restrictive meaning.'" Am. Bankers Ass'n v. Gould, 412 F.3d 1081, 1086 (9th Cir. 2005) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)).  Courts also start with the presumption that Congress has not intended to preempt state law, because we assume "'that the historic police powers of the States [are] not to be superseded by [federal legislation] unless that is the clear and manifest purpose of Congress.'"  Id. (quoting  Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992)).

In this case, the plain language of the FCRA only mentions claims "in the nature of defamation, invasion of privacy, or negligence"; it does not purport to preempt, or grant immunity from, every conceivable type of claim that could arise under a state statute. Accordingly, I conclude that the FCRA does not preempt Plaintiff's state-law claims under the NMCBA in this case.  Further, there are disputed issues of material fact which preclude summary judgment on Plaintiff's NMCBA claims for essentially the same reasons previously expressed in my analysis of Plaintiff's FCRA claims.

Equifax expresses a concern that if Plaintiff is allowed to proceed on both her FCRA claims and her NMCBA claims, there is a potential that she may recover twice for the same injuries.  This concern is unwarranted, because it is this Court's practice to instruct the jury that it may not award compensatory damages twice for the same injury, regardless of whether that injury resulted from the violation of two or more different laws.  See, e.g., Realivasquez

v. City of Albuquerque, No. CIV. 03-15 MCA/KBM  (D.N.M. jury instructions filed Mar.

12, 2004).   Thus, I conclude that the issue of double recovery is more appropriately

addressed in the Court's jury instructions and does not provide any grounds for granting

summary judgment.

**III.**    **CONCLUSION**

For the foregoing reasons, the issue of Plaintiff's experience at the "Unpainted

Furniture" store is moot, and there are genuine issues of material fact which preclude

summary judgment on the issues of willfulness, punitive damages, the Wells Fargo credit-

card application, and Plaintiff's state-law claims under the NMCBA.

**IT IS THEREFORE ORDERED** that *Defendant Equifax's Motion for Partial*

*Summary Judgment* [Doc. 173] is **DENIED**.

**SO ORDERED** this 2nd day of March, 2006, in Albuquerque, New Mexico.

_____

**M. CHRISTINA ARMIJO**
**UNITED STATES DISTRICT JUDGE**